## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| CANDICE MILES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-378 (RBW) |
| | ) | |
| UNIVERSITY OF THE DISTRICT OF | ) | |
| COLUMBIA and HOWARD UNIVERSITY, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## <u>MEMORANDUM OPINION</u>

The plaintiff, Candice Miles, filed this civil action against defendants Howard University ("Howard") and the University of the District of Columbia ("UDC"), alleging violations of the federal Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615 (2012), the District of Columbia Family and Medical Leave Act ("DCFMLA"), D.C. Code §§ 32-501 to -517 (2001), and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01 to -1431.08 (2001). Complaint ("Compl.") ¶¶ 107-39. Currently before the Court are the defendants' motions to dismiss the plaintiff's complaint, and the plaintiff's motion for leave to amend her complaint to include a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) (2012). For the reasons explained below, the Court must deny the defendants' motions to dismiss and grant the plaintiff's motion to amend her complaint.[1]

_____

[1] In deciding the parties' motions, the Court considered the following filings made by the parties in addition to those already identified: (1) Defendant Howard University's Memorandum in Support of its Motion to Dismiss the Complaint for Failure to State a Claim Upon Which Relief can be Granted ("Howard's Dismiss Mem."); (2) Plaintiff Candice Miles' Memorandum of Points and Authorities in Opposition to Defendant Howard University's Motion to Dismiss the Complaint for Failure to State a Claim Upon Which Relief can be Granted ("Pl.'s Howard Opp'n"); (3) Defendant Howard University's Reply Brief in Further Support of Motion to Dismiss ("Howard's Reply"); (4) the Memorandum in Support of Defendant the University of the District of Columbia's Motion to

(continued . . .)

# I. BACKGROUND

The plaintiff's complaint alleges the following in support of her claims.

## A. The D.C. Small Business Development Center Network and the Plaintiff's Employment

For over twenty years, Howard has "operate[d] the Lead Center for the District of Columbia Small Business Development Center Network [("D.C. Network")] . . . under an annually renewable grant from the United States Small Business Administration." Compl. ¶ 9. "The . . . [D.C.] Network is accredited by the Association of Small Business Development Centers." Id. Howard and the Small Business Administration negotiate the performance goals by which the amount of the grant is measured. Id. ¶ 10. In turn, Howard "awards sub-grants to . . . different organizations" within the D.C. Network to operate D.C. Network Service Centers, "including UDC, the Anacostia Economic Development Corporation [], and the D.C. Chamber of Commerce." Id. ¶ 11. The Service Centers provide various consulting and educational services to small businesses. Id. ¶ 12. Howard and the various Service Center organizations within the D.C. Network "frequently refer clients to one another and provide services based upon the expertise and resources of each Center and the convenience of the client." Id. ¶ 13. The

---

(. . . continued)
Dismiss ("UDC's Dismiss Mem."); (5) Plaintiff Candice Miles' Opposition to Defendant University of the District of Columbia's Motion to Dismiss ("Pl.'s UDC Opp'n"); (6) the Reply in Support of Defendant the University of the District of Columbia's Motion to Dismiss ("UDC's Dismiss Reply"); (7) Plaintiff Candice Miles' Memorandum in Support of Her Motion for Leave to File an Amended Civil Complaint for Monetary Relief and Demand for Jury Trial ("Pl.'s Mem."); (8) Defendant Howard University's Memorandum of Law in Opposition to Plaintiff's Motion for Leave to Amend the Complaint ("Howard's Opp'n"); (9) Defendant the University of the District of Columbia's Opposition to the Plaintiff's Motion for Leave to File an Amended Complaint ("UDC's Opp'n"); (10) Plaintiff Candice Miles' Motion to Withdraw her Amended Complaint for Monetary Relief and Demand for Jury Trial ("Pl.'s Withdraw Mot."); (11) Defendant the University of the District of Columbia's Consent to Plaintiff's Motion to Withdraw the Amended Complaint ("UDC's Consent Mot."); and (12) Defendant Howard University's Consent to Plaintiff's Motion to Withdraw the Amended Complaint ("Howard's Consent Mot.").

relationship between Howard and the Service Centers is set forth in the D.C. Small Business Development Center Network Standard Operating Procedures ("Procedures"). <u>Id.</u> ¶¶ 14-16.

The plaintiff, Candice Miles, is a Maryland resident who was previously employed in two capacities within the D.C. Network. From March 2007 until early January 2009, she was a Senior Small Business Development Specialist with the Anacostia Economic Development Corporation, <u>id.</u> ¶¶ 1, 27, 30, and from January 5, 2009 until June 30, 2011, she was the Director of the UDC Service Center, <u>id.</u> ¶¶ 1, 30. Before the plaintiff began her employment with UDC, "the Director position at the UDC Service Center was vacant for over six months," <u>id.</u> ¶ 37, and "[d]uring the eight years prior to [the plaintiff being] hir[ed for that position], there was high turnover in the positions of Director and Small Business Consultant at the UDC Service Center," <u>id.</u> ¶ 39. During the time immediately prior to the plaintiff's tenure with the UDC Service Center, the "Center referred many clients to other Service Centers" within the D.C. Network. <u>Id.</u> ¶ 37. "Referring clients between Service Centers is a regular business practice of the [D.C. Network] and [is] facilitated by the . . . [Procedures'] guidance on record storage." <u>Id.</u> ¶ 38. The plaintiff's UDC "position was a Sponsored Program Appointment, and her position had a not-to-exceed date of September 30, 2009." <u>Id.</u> ¶ 32. However, "UDC extended the not-to-exceed date each year and starting in September 2009, UDC deducted retirement benefits and health insurance premiums from [the plaintiff's] paycheck." <u>Id.</u>

Between April and July 2010, the D.C. Network's training director, finance director, and director all resigned from their positions. <u>Id.</u> ¶¶ 29, 42. "As of July 30, 2010, the staff of Howard's Lead Center consisted of an Associate State Director, an acting Director of Finance, and an Administrative Assistant." <u>Id.</u> ¶ 43. "In August 2010, . . . Don Wilson, the former president of the [Association of Small Business Development Centers,] . . . [became] a

consultant for the [D.C. Network]." Id. ¶ 46. His "responsibilities included assisting the . . . [D.C. Network] with the upcoming accreditation review, leading the search for a new Executive Director" of the D.C. Network, "and handling the day-to-day operations of the remaining staff at Howard's Lead Center." Id. ¶ 47. He "did not resume the regularly scheduled meetings" that the former Executive Director had required of personnel at the Centers, id. ¶¶ 35-36, 41, 48, and he also "failed to assist the Service Centers in coordinating their work and achieving their contractually required goals." Id. ¶ 48.

**B.      The Plaintiff's Pregnancy and FMLA/DCFMLA Leave**

On August 16, 2010, the plaintiff's doctor confirmed that the plaintiff was pregnant. Id. ¶ 44. She "immediately notified Hattie Rogers in UDC's Human Resources department of her pregnancy and inquired about maternity benefits," and "notified her Administrative Assistant, Aura Garcia, at this time." Id. ¶ 45. She additionally notified UDC's Acting Provost and Vice President, Academic Affairs and Dean of Business and Public Administration, Charlie Mahone, of her pregnancy in October 2010. Id. ¶¶ 33, 49. "During the Winter of 2010, [the plaintiff] also informed . . . [the] Director of the [Anacostia] Service Center[] of her pregnancy." Id. ¶ 59. "Also in or about January 2011, [the plaintiff] informed the [D.C. Network] Assistant Director and acting Executive Director, Eldridge Allen, of her pregnancy." Id. ¶ 55. The plaintiff additionally "informed other staff members at the Lead Center of her pregnancy . . . in or about January 2011." Id. ¶ 56. "In or about February 2011, [the plaintiff] informed [Hattie] Rogers [of UDC's Human Resources Department] of her intent to take the maximum amount of leave provided by the DCFMLA starting on her anticipated due date, April 3, 2011, and submitted the necessary paperwork, including a certification from her physician." Id. ¶ 58.

"On multiple occasions [during the Winter of 2010], the plaintiff and [the Director of the Anacostia Service Center] discussed referring clients to the [Anacostia Service Center] during [the plaintiff's] maternity leave." Id. ¶ 59. The plaintiff "also met with [her Administrative Assistant] and informed her that the UDC Service Center would have to refer clients to the [Anacostia Service Center] and other [D.C. Network] offices during her absence," and "instructed [her Administrative Assistant] to continue to host workshops and to work closely with the [Anacostia Service Center] to ensure that clients' counseling needs [we]re met." Id. ¶ 60. The plaintiff "intended to meet with [Charlie] Mahone to discuss her plan to manage the UDC Service Center while on FMLA leave but was unable to do so because Mahone himself was out on medical leave." Id. ¶ 61.

"On or about March 7, 2011, . . . [the plaintiff's] doctor unexpectedly placed her on temporary bed rest due to complications with her pregnancy," and "[o]n or about Friday, March 11, 2011, [her] doctor placed her on bed rest for the duration of her pregnancy." Id. ¶¶ 66, 68. The plaintiff informed Mahone of the complications, "and after discussing it with Mahone, sent an email to senior [D.C. Network] staff regarding her medical leave." Id. ¶¶ 66, 69. "On or about March 14, 2011, [the Howard Lead Center Director] emailed [the plaintiff] and called [her Administrative Assistant] to inquire into [the plaintiff's] FMLA leave and her plan to operate the center while on FMLA leave." Id. ¶ 70. The plaintiff asked her Administrative Assistant to inform the Lead Center Director "about the plan to transfer clients to other [D.C. Network] . . . Service Centers, in accordance with existing . . . practice and policy," and tell him to "contact [Hattie] Rogers" in the UDC Human Resources Department "regarding UDC's FMLA policy." Id. ¶¶ 62, 70. The plaintiff remained "in continuous contact with Mahone, Rogers, and Garcia" while she was on bed rest. Id. ¶ 71. "Through induced labor on or about March 24, 2011, [the

plaintiff] gave birth several weeks before her expected due date." Id. ¶ 72. The next day, "at the end of [the plaintiff's] short-term disability, UDC granted [her] FMLA medical leave from on or about April 3, 2011, through on or about June 14, 2011." Id. ¶ 73. On or about April 19, 2011, the plaintiff also received a letter from Hattie Rogers which "stat[ed] that UDC approved [the plaintiff] to take family leave under the FMLA from May 7, 2011[,] through August 26, 2011." Id. ¶ 81.

**C.      The Accreditation Process and the Accreditation Deferral**

During the Fall of 2010, Don Wilson asked the "Service Center Director[s] to work with the Lead Center to prepare documents for the [D.C. Network's] upcoming accreditation review by the [Association of Small Business Development Centers]," and he also "required each Service Center Director to attend a daylong training session in preparation for the accreditation." Id. ¶¶ 50-51. Wilson later "changed his mind and excluded the Service Center Directors from the accreditation process which took place in or about December 2010." Id. ¶ 52. Shortly thereafter, "[i]n or about January 2011, Jason Cross, Director of the D.C. Chamber of Commerce's Service Center, announced his resignation." Id. ¶ 53. "During the subsequent months, while the D.C. Chamber of Commerce Service Center was without a Director, the Service Center referred clients to other Service Centers in accordance with the normal practice of the [D.C. Network]." Id. ¶ 54.

"On or about February 23, 2011, Howard's Lead Center held a [D.C. Network] meeting to introduce its new Executive Director, Darrell Brown." Id. ¶ 62. At that time, "[Don] Wilson

indicated that the . . . Network would likely receive a deferral[2] from the [Association of Small Business Development Centers] Accreditation Committee." Id. ¶ 63. The next month, "[i]n March 2011, . . . the [Accreditation Committee] issued the [D.C. Network] a deferral and listed numerous deficiencies . . . ." Id. ¶ 65.

## D. The Plaintiff's Termination

"On or about April 7, 2011, [Darrell] Brown, the [D.C. Network's] new Executive Director[,] sent a letter to [Charlie] Mahone informing him that the UDC Service Center was being placed on probation, and requiring the preparation of a written recovery plan within 30 calendar days." Id. ¶ 74. The letter stated in part:

> Based upon our performance review analysis of the UDC [S]ervice [C]enter, the review of the [Association of Small Business Development Center]'s accreditation team, and our meeting with you on April 1, 2011, I have concluded that the performance level of the [U]DC [Service Center] is seriously deficient.
>
> Specifically:
>
> . . . .
>
> • [T]he Service Center Director is currently on maternity leave. She took leave without prior notification to the Executive Director. She notified the Executive Director she was taking leave only after her leave started and she failed to make any meaningful provision for the continuation of client services at the UDC [S]ervice [C]enter. Moreover, the Center Director failed to communicate to the Executive Director a specific date and time for returning to work. The Center Director essentially abandoned the [S]ervice [C]enter and its clients by her failure to take the necessary and proper steps to assure viable operation of the [S]ervice [C]enter. Further, the Center Director failed to communicate to the Executive Director that the [S]ervice [C]enter would cease to function when she took maternity leave. Today, the [S]ervice [C]enter is not functioning except for making referrals to other service centers.
>
> . . . .

_____

[2] Deferrals "require[] a network to create a work plan and address all of the findings of the Accreditation Committee listed in their report within a 12-month period. A deferral of accreditation also puts a network in jeopardy of losing its grant funding from the [Small Business Administration]." Compl. ¶ 64.

In drafting the UDC [Service Center] recovery plan, you may wish to consider:

- [R]eplacing the Service Center Director with a more experienced person, who has an educational background and meaningful experience in marketing, business development, consulting, and communications. Should you decide to replace the Service Center Director, the final selection of a new Service Center Director shall be subject to the Lead Center's approval.

Id. ¶¶ 75-76.

The plaintiff "learned of the existence of Brown's April 7, 2011 letter" on April 11, 2011, id. ¶ 78, and "pick[ed] up a copy of the letter" from UDC on April 13, 2011, id. ¶ 79. She first spoke with "Renae Lee, a UDC Human Resources Specialist, regarding Brown's letter." Id. ¶ 79. "Lee referred [the plaintiff] to UDC's Manager of Diversity and Equity, Yasmin Mitchell," id., and the plaintiff spoke with Mitchell on April 19, 2011, id. ¶ 80. Mitchell instructed the plaintiff to speak with Charlie Mahone, id., and "[o]n or about April 27, 2011, [the plaintiff] emailed Mahone requesting a time to speak about the letter," id. ¶ 82. Mahone indicated that he did not want to speak with her, and would rather have her provide "information [to him] by the close of business on or about April 28, 2011." Id. The plaintiff responded by email, id. ¶ 83, but "[o]n May 3, 2011, Mahone rejected [her] response," id. ¶ 84.

"On or about May 5, 2011, [the plaintiff] contacted Mitchell to discuss Mahone's response," and "Mitchell informed [the plaintiff] that due to concerns with [the plaintiff] working while on FMLA leave, Mahone would cease questioning her regarding Brown's April 7, 2011 letter." Id. ¶ 86. The next day, "Mahone emailed [the plaintiff]" and stated that he was "surprised that [he] ha[d] not received a response to [his] last email," and requested that the plaintiff provide a response. Id. ¶ 87. The plaintiff thus responded with an email in which she "expand[ed] on her plan for improving the performance of the UDC Service Center, explain[ed] her failure to respond to Mahone's prior email, and reiterate[ed] her dedication to the Service

Center and intent to return upon the completion of her maternity leave." <u>Id.</u> ¶ 88. A few days later, the plaintiff "again spoke with Mitchell regarding her ability to work to address the situation with the UDC Service Center while on leave" and subsequently "traveled to UDC on or about May 17, 2011, and again discussed the subject with Mitchell." <u>Id.</u> ¶ 89. Mitchell advised the plaintiff "that she had spoken with Mahone, who would no longer contact [the plaintiff] while [she was] on FMLA leave." <u>Id.</u>

On May 20, 2011, the plaintiff learned that Howard had terminated funding for the UDC Service Center. <u>Id.</u> ¶¶ 91-92. "With the exception of UDC, Howard renewed all of the Service Center sub-awards for 2012 . . . ." <u>Id.</u> ¶ 102. The plaintiff spoke with her administrative assistant on June 7, 2011, "who told her Mahone stopped by the office and informed her that the actual termination [of the UDC sub-award] would take place on June 30, 2011." <u>Id.</u> ¶ 94. The plaintiff received a voice message from Mahone on June 29, 2011, and the two spoke on June 30, 2011. <u>Id.</u> ¶ 95. "Mahone informed [the plaintiff] that Howard closed the UDC Service Center and stated that her future at UDC was unknown." <u>Id.</u> Later on June 30, 2011, the plaintiff spoke with UDC Human Resource Specialist Lee, who "stated that [the plaintiff's] matter had been referred to UDC's general counsel, and [the plaintiff] should hear back by on or about Friday, July 8, 2011." <u>Id.</u> ¶ 97.

The plaintiff was formally notified on July 15, 2011, that her employment had been terminated effective June 30, 2011. <u>Id.</u> ¶ 98. The letter "demanded that [the plaintiff] report to Lee for an exit interview and return all UDC property" by July 22, 2011, and "also informed [the plaintiff] that her FMLA leave was rescinded and that [she] was eligible for 31 days of free health insurance." <u>Id.</u> ¶ 99. Finally, the letter "allege[d] that UDC overpaid [the plaintiff] by $728.46 while on short-term disability, and stated that UDC was withholding" the plaintiff's

final paycheck until she returned the amount of the overpayment.  Id.  The letter directed the plaintiff to contact Keith Poindexter about the pay discrepancy, who told the plaintiff "that UDC's letter was inaccurate due to UDC's miscalculation of [the plaintiff's] leave, and that he would follow up with her by July 22, 2011."  Id. ¶ 100.  However, the plaintiff did not hear from Poindexter, id., and "[t]o date, UDC has not provided [the plaintiff] with an accurate accounting of the overpayment which it alleges she owes, and has not paid [the plaintiff] her final paycheck."  Id. ¶ 106.

The plaintiff "submitted a written Equal Employment Opportunity [("EEO")] complaint to Mitchell" on September 7, 2011, "alleging that UDC violated [the plaintiff's] rights under the FMLA," as well as complaining about the statements in Brown's April 7, 2011 letter.  Id. ¶ 103.  "On November 9, 2011, Mitchell emailed [the plaintiff] and stated that [her] EEO complaint should be filed with Howard."  Id. ¶ 104; see also id. ¶ 105.

The plaintiff then filed this action against Howard and UDC alleging violations of the FMLA, the DCFMLA, and the DCHRA.  She has also filed a motion seeking leave to amend her complaint to include a Title VII claim.  The defendants have filed motions to dismiss the plaintiff's claims, arguing that she has failed to state claims upon which relief may be granted, and they additionally oppose the plaintiff's motion to amend her complaint on the grounds that the proposed amendments are untimely as a matter of law and would otherwise be futile.

## II.  STANDARDS OF REVIEW

### A.    Rule 12(b)(6) Motion to Dismiss

A Federal Rule of Civil Procedure 12(b)(6) motion tests whether the complaint "state[s] a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).  While the Court must "assume [the] veracity" of any "well-pleaded factual allegations" in the complaint, conclusory allegations "are not entitled to the assumption of truth."  Id. at 679. In evaluating a Rule 12(b)(6) motion under this framework, "[t]he complaint must be liberally construed in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979) (internal quotation marks and citations omitted), and the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice," EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997) (footnote omitted).

## B.    Rule 15 Motion to Amend

"A party may amend its pleading once as a matter of course" before the adverse party has filed a responsive pleading.  Fed. R. Civ. P. 15(a).  However, after a responsive pleading has been filed, the initial pleading may be amended "only with the opposing party's written consent or the court's leave."  Id.  While the Court has sole discretion to grant or deny leave to amend, "[l]eave to amend a [pleading] should be freely given in the absence of undue delay, bad faith, undue prejudice to the opposing party, repeated failure to cure deficiencies, or futility." Richardson v. United States, 193 F.3d 545, 548-49 (D.C. Cir. 1999) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  The rationale for this perspective is that "[i]f the underlying facts or

circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." Foman, 371 U.S. at 182.

## III. LEGAL ANALYSIS

Howard's motion to dismiss relies, at least in part, on the theory that it was not a joint employer of the plaintiff. Howard's Dismiss Mem. at 12-20. Accordingly, before addressing the merits of its motion to dismiss, the Court must first determine whether Howard and UDC jointly employed the plaintiff for the purposes of the FMLA, the DCFMLA, or the DCHRA. After deciding these questions, the Court will then address the plaintiff's motion to amend her complaint.

### A.     The Joint Employment Tests

#### 1.     The FMLA Joint Employment Test

The implementing regulations of the FMLA provide:

Where two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be joint employers under the FMLA. Joint employers may be separate and distinct entities with separate owners, managers, and facilities. Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:

(1) Where there is an arrangement between employers to share an employee's services or to interchange employees;

(2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or,

(3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, or is controlled by, or is under common control with the other employer.

29 C.F.R. § 825.106(a) (2012).  The regulations provide further that "[a] determination of whether or not a joint employment relationship exists is not determined by the application of any single criterion, but rather the entire relationship is to be viewed in its totality." Id. § 825.106(b)(1).

The District of Columbia Circuit has not spoken directly to the factors appropriately considered by courts in determining whether two or more employers are joint employers under the FMLA.  However, "[c]ourts in this jurisdiction have used one of two legal tests to determine whether a plaintiff worked for joint employers" in other contexts.  Konah v. Dist. of Columbia, 815 F. Supp. 2d 61, 70 (D.D.C. 2011) (citing Redd v. Summers, 232 F.3d 933 (D.C. Cir. 2000); Spirides v. Reinhardt, 613 F.2d 826 (D.C. Cir. 1979)).  Each test comprises "a relatively open-ended, fact-intensive inquiry."  Id.  In Redd, the Circuit observed that, "[f]or a joint employment test, a fairly standard formulation is that of the Third Circuit," which directs courts to consider "'whether one employer[,] while contracting in good faith with an otherwise independent company, has retained for itself sufficient control over the terms and conditions of employment of the employees who are employed by the other employer.'"  232 F.3d at 938 (alteration in original) (quoting NLRB v. Browning-Ferris Indus. of Pennsylvania, Inc., 691 F.2d 1117, 1123 (3d Cir. 1982)).  However, the Redd court did not apply the Third Circuit test.  Id.  Rather, while the court observed that it "ha[d] never invoked Spirides to resolve an issue of joint employment," it nonetheless applied the test set forth in Spirides.  Id.  Under Spirides,

> one criterion-the putative employer's "right to control the 'means and manner' of the worker's performance"-[is] central to classification as an employee or independent contractor. . . . [I]f the putative employer has "the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist."  [Courts should then consider] eleven "[a]dditional matters of fact" that may be relevant.

Id. (citing and quoting Spirides, 613 F.2d at 831-32). The eleven "additional" Spirides factors

are:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

613 F.2d at 832. In applying the test, "[t]he eleven factors should ideally be used to address the

question of control-with both control and the eleven factors being evaluated simultaneously."

Redd, 232 F.3d at 938.

Several other circuits have provided guidance or set forth tests for determining whether

two or more employers are joint employers for FMLA purposes. See, e.g., Grace v. USCAR,

521 F.3d 655, 666-67 (6th Cir. 2008) (focusing analysis on amount of control each employer

maintained over employee by considering which employer managed the employee's payroll,

benefits, supervision, and salary and hour determinations); Moldenhauer v. Tazewell-Pekin

Consol. Commc'ns Ctr., 536 F.3d 640, 644 (7th Cir. 2008) ("[W]e hold generally that for a joint-

employer relationship to exist, each alleged employer must exercise control over the working

conditions of the employee, although the ultimate determination will vary depending on the

specific facts of each case."); Engelhardt v. S.P. Richards Co., 472 F.3d 1, 4 n.2 (1st Cir. 2006)

(observing that the FMLA joint employer test "looks to whether there are sufficient indicia of an

employer/employee relationship to justify imposing liability on the plaintiff's non-legal

employer"); Moreau v. Air France, 356 F.3d 942, 946 (9th Cir. 2004) (considering two tests, the

first: "'whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payment, (3) determined the rate and method of payment, and (4) maintained employment records,'" and the second: "'(A) The nature and degree of control of the workers; (B) The degree of supervision, direct or indirect, of the work; (C) The power to determine the pay rates of the methods of payment of the workers; (D) The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; and (E) Preparation of payroll and the payment of wages'" (citations omitted));

Morrison v. Magic Carpet Aviation, 383 F.3d 1253, 1258 (11th Cir. 2004) (finding no joint employment relationship where putative joint employers "did not 'share' [the employee's] service" and where one of the employers "lacked direct control over" either the employee or the other employer). And for their part, the parties urge the Court to look to case law construing the joint employment provisions of the Fair Labor Standards Act. Howard's Dismiss Mem. at 14 (setting forth "a four-factor 'economic reality test' borrowed from [the] Fair Labor Standards Act"); Pl.'s Opp'n at 10 (same). Under the Fair Labor Standards Act, courts consider:

> whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.

Ivanov v. Sunset Pools Mgmt., Inc., 567 F. Supp. 2d 189, 195-96 (D.D.C. 2008) (quotation marks and citation omitted); see also Morrison v. Int'l Programs Consortium, Inc., 253 F.3d 5, 11 (D.C. Cir. 2001) (setting forth the same four-factor test for determining employment status under the Fair Labor Standards Act). As with the general joint employer tests that have been applied in this Circuit, each of the existing FMLA-specific joint employer tests applied in other circuits as well as the employment status test applied in the Fair Labor Standards Act context

comprise fact-intensive inquiries that center largely on the amount of control an employer has over an employee. Because these tests are not materially different from the general joint employment tests announced and applied in this Circuit, the Court will apply the tests used in Browning-Ferris and Spirides to determine whether Howard was the plaintiff's joint employer for FMLA purposes.

### 2.     The DCFMLA Joint Employment Test

The language used in the implementing regulations of the DCFMLA, which is the District of Columbia's local counterpart to the FMLA, is identical to the language found in the FMLA. Compare 4 DCMR § 1602.1-.2, with 29 C.F.R. § 825.106(a). And like the FMLA, the DCFMLA provides that no "single criterion" governs the determination of whether two or more employers are joint employers, "but rather the entire relationship [is] viewed in the totality." 4 DCMR § 1602.3; see also 29 C.F.R. § 825.106(b)(1).

Although it has not articulated a joint employer test, the District of Columbia Court of Appeals "look[s] to FMLA regulations and case law as persuasive authority in interpreting" the DCFMLA. Chang v. Inst. for Public-Private P'ships, Inc., 846 A.2d 318, 327 (D.C. 2004); see also Cobbs v. Bluemercury, Inc., 746 F. Supp. 2d 137, 142 (D.D.C. 2010) (noting that the showings required to state a prima facie case under the DCFMLA and FMLA are the same). Accordingly, the Court will also apply the Browning-Ferris and Spirides joint employer tests to the plaintiff's DCFMLA claims.

### 3.     The DCHRA Joint Employment Test

As to the DCHRA, the Court "notes that DCHRA claims are generally scrutinized under the same legal framework used by courts to analyze claims under Title VII," Konah, 815 F. Supp. 2d at 71 (citing, among others, Sparrow v. United Air Lines, 216 F.3d 1111, 1114 (D.C.

Cir. 2000)), unless "there is an indication either from legal precedent or statutory language that the DCHRA is meant to depart from the federal courts' Title VII jurisprudence," id. (citing Evans v. Wash. Ctr. for Internships & Acad. Seminars, 587 F. Supp. 2d 148, 151 (D.D.C. 2008); Lively v. Flexible Packaging Ass'n, 830 A.2d 874, 890 (D.C. 2003)).

Other federal circuits have "applied the standards promulgated by the National Labor Relations Board ("NLRB")" to determine whether two or more employers are joint employers for Title VII purposes. See Cardinale v. S. Homes of Polk Cnty, Inc., 310 F. App'x 311, 313 (11th Cir. 2009) (citing McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 933 (11th Cir. 1987) (collecting cases from the Sixth and Ninth Circuits)). Under the NLRB standards, courts determine joint employer status by considering indications of "interrelation of operations, common management, centralized control of labor relations and common ownership." Radio & Television Broad. Technicians Local Union 1264 v. Broad. Serv. of Mobile, Inc., 380 U.S. 255, 256 (1965). However, this Circuit has not adopted the NLRB standards test in the Title VII context. Moreover, other members of this Court have recently applied the Browning-Ferris and Spirides tests to determine whether a joint employment relationship exists for purposes of Title VII. See, e.g., Konah, 815 F. Supp. 2d at 71; Harris v. Attorney Gen., 657 F. Supp. 2d 1, 8-9 (D.D.C. 2009). And there is no indication in District of Columbia case law or in the statutory or regulatory language of the DCHRA that it would be inappropriate to apply Title VII case law to the plaintiff's DCHRA claims. Indeed, the Browning-Ferris and Spirides tests were applied to DCHRA claims in Konah. 815 F. Supp. 2d at 70-71. Accordingly, this Court concludes that the Browning-Ferris and Spirides tests are the appropriate tests under which to analyze Title VII

joint employment questions, which in turn makes those same tests applicable to the plaintiff's

DCHRA claims.[3]

###    4.    Whether Howard was the Plaintiff's Employer

Under the Browning-Ferris test, the Court must determine whether Howard "'retained for

itself sufficient control over the terms and conditions of [her] employment [even though she was]

employed by [UDC].'"  Redd, 232 F.3d at 938 (citation omitted).  And under Spirides, "an

employer/employee relationship is likely to exist" if the putative employer has the "right to

control the 'means and manner' of the worker's performance."  613 F.2d at 831-32.  Howard

raises factual issues that might shed light on whether and to what extent it controlled the

plaintiff's terms and conditions of employment.  Specifically, Howard contends that it had only

the right to "concur" in hiring the plaintiff, and did not have any authority whatsoever to

terminate her employment.  Howard's Dismiss Mem. at 15.  Howard contends further that it did

not control the plaintiff's work schedule or conditions of employment, id. at 16, salary, benefits,

or methods of payment, id. at 17, or maintain any employment records concerning the plaintiff,

id.  In making these arguments, Howard points to the D.C. Network Procedures, which are

referenced in the complaint and also attached to Howard's motion to dismiss.

The Procedures make clear that Howard has retained control over hiring individuals in

the plaintiff's former position.  Specifically, Howard "must concur in the appointment of the

---

[3] Even if the Court applied the test outlined in Radio & Television Broadcasting, 380 U.S. at 256, other courts have
noted that the joint employer "determination depends upon the particular facts and circumstances of each case, and
consequently the federal courts have varied somewhat in their application" of the criteria, Sheeran v. Am.
Commercial Lines, Inc., 683 F.2d 970, 978 (6th Cir. 1982) (collecting cases).  And because "control of the essential
elements of labor relations is a prerequisite to the existence of a joint-employer relationship," id. (citation omitted),
the Radio & Television Broadcasting test, like the Browning-Ferris and Spirides tests, ultimately presents a factual
question concerning the amount of control a putative joint employer has over an employee.  The tests are thus not
materially different from one another.

Service Center Director." Compl. ¶ 15 (emphasis added); Howard's Dismiss Mem., Ex. A (The District of Columbia Small Business Development Center Standard Operating Procedures ("Procedures")) § 2.5(1) (emphasis added); see also Compl. ¶¶ 16-17. And the April 7, 2011 Brown letter stated that if UDC terminated the plaintiff as suggested, "the final selection of a new Service Center Director shall be subject to [Howard's] approval." Compl. ¶ 76 (emphasis added); Howard's Dismiss Mem., Ex. C (April 7, 2011 Letter ("Brown Letter")) at 3 (emphasis added). However, the complaint provides only conclusory allegations concerning Howard's ability to terminate the plaintiff's employment. See, e.g., Compl. ¶ 108 ("Defendants jointly controlled the terms and conditions of [the plaintiff's] employment, including the authority to discipline or terminate [her]."). What is clear from the current record is that Howard's ability to terminate the plaintiff's employment was indirect, and through its ability to terminate the UDC Service Center's funding. See Compl. ¶ 101 ("Miles' employment with UDC and Howard would have continued but for Howard's termination of the UDC sub-award."); see also Pl.'s Howard Opp'n at 12.

The complaint also alleges that at one point while serving as director the plaintiff and other Service Center Directors were attending monthly meetings with Turner, the former Executive Director at Howard, Compl. ¶¶ 34, 41, and that "[d]uring [the] monthly meetings with Turner, [she] was responsible for submitting a report outlining progress, successes, failures, and an action plan to correct any failures or areas that were not on track to meet performance goals outlined in the contract," id. ¶ 35. Further, the plaintiff represents that she was required "to attend and host certain meetings and workshops," and was also subject to a "semi-annual review of the performance of the" UDC Service Center by Turner and his staff. Id. ¶ 36. She also

alleges that at another point in time she was occasionally required to attend training meetings

hosted by Howard.  Id. ¶¶ 50-51.

The complaint makes no reference to Howard's control of the plaintiff's salary, benefits,

or methods of payment, or to the maintenance of any employment records concerning the

plaintiff.[4]  See generally Compl.  Rather, the plaintiff argues that Howard maintained indirect

control over her salary and benefits through its "control over the sub-grant amount."  Pl.'s

Howard Opp'n at 13 (citing Compl. ¶ 10 ("The amount of Howard's grant is measured by agreed

upon performance goals between the [Small Business Association] and Howard.")).

Taking the plaintiff's nonconclusory allegations as true, as the Court must do at this stage

of the case, Iqbal, 556 U.S. at 678-79, the Court cannot determine with certainty that Howard

and UDC were not joint employers of the plaintiff.  Rather than clarifying the question of joint

employment, the documents quoted extensively and incorporated in the complaint, as well as

those same documents attached to Howard's motion to dismiss, create a factual issue.  See, e.g.,

Boire v. Greyhound Corp., 376 U.S. 473, 481 (1964) ("Whether [the putative employer]

possessed sufficient indicia of control to be an 'employer' is essentially a factual issue."); Brown

v. Corr. Corp. of Am., 603 F. Supp. 2d 73, 79 (D.D.C. 2009) ("Determining whether [the

defendants] were [the] plaintiff's joint employers . . . . [is] a factual issue [that] is plainly

inappropriate to resolve on a motion to dismiss pursuant to Rule 12(b)(6)."); Coles v. Harvey,

471 F. Supp. 2d 46, 51 (D.D.C. 2007) (finding that the plaintiff "sufficiently pled that she was a

---

[4] In a footnote in her opposition to Howard's motion to dismiss, the plaintiff states that "[w]hile not specifically alleged in her complaint, the [Procedures] . . . require[] [Howard] to maintain personnel files containing details on discipline, training and other information for each employee including [the] Service Center Directors."  Pl.'s Howard Opp'n at 13 n.2.  She further alleges that "Howard omitted these pages from its Exhibit A" and that she will "add these details" if she is permitted to amend her complaint.  Id.  The Court will not take these allegations into consideration, because it is axiomatic that the plaintiff may not amend her complaint through facts first alleged in an opposition brief.  See, e.g., Sloan v. Urban Title Servs., Inc., 689 F. Supp. 2d 94, 114 (D.D.C. 2010).

joint employee" of two employers and the "[d]efendant's factual assertions do not establish the contrary as a matter of law"); cf. Dean v. Am. Fed'n of Gov't Emps., Local 476, 549 F. Supp. 2d 115, 122 (D.D.C. 2008) (observing that the court had a factual record upon which to conduct the joint employer test because "discovery has already been conducted" and the "[p]laintiff has had the opportunity to proffer all relevant evidence regarding the" employment relationship). Tellingly, the majority of the cases cited in support of Howard's arguments that it did not employ the plaintiff address motions for summary judgment.[5] See Howard's Dismiss Mem. at 12-20.

The plaintiff's allegations have established that Howard retained at least some control over the terms and conditions of her employment, and the Court is not convinced by Howard's statements to the contrary that the amount of control that Howard retained for itself was insufficient as a matter of law to overcome the plaintiff's allegations. Accordingly, the Court assumes at this stage of the proceedings that the plaintiff was jointly employed by both Howard and UDC for purposes of the FMLA, DCFMLA, and the DCHRA.[6]

---

[5] The cases cited by Howard that address motions to dismiss are either easily distinguished from the facts alleged by the plaintiff, or reach the same conclusion that this Court reaches. See Konah, 815 F. Supp. 2d at 70-71 (plaintiff's complaint did "not allege . . . that she was employed by the District of Columbia," included no facts from which the court could conclude that the District of Columbia might be the plaintiff's employer, and the plaintiff instead "ask[ed] the court to allow discovery against the District, which might ultimately show that the District acted as a joint employer"); Jensen v. AT&T Corp., No. 4:06-CV-842, 2007 WL 3376893, at *2-3 (E.D. Mo. Nov. 13, 2007) (plaintiff's complaint failed to allege that putative employer had any control over her employment); Coles, 471 F. Supp. 2d at 51 (finding a genuine issue of fact as to whether the defendants jointly employed the plaintiff and declining to resolve the issue on a motion to dismiss).

[6] Howard argues in a footnote that the Court should disregard the plaintiff's allegations "[t]o the extent that [they] . . . conflict with the contents of the [Procedures]." Howard's Dismiss Mem. at 15 n.5 (citing Scott v. United States, 608 F. Supp. 2d 73, 81 (D.D.C. 2009)). In particular, Howard references the plaintiff's "allegation that Howard had joint authority with UDC to discipline or terminate" her. Id. Unlike in Scott, where the plaintiffs alleged that they had not received notices of a tax lien but attached to their complaint documents referencing the very notices about which they complained, id., the plaintiff's allegations here are not conclusively contradicted by the Procedures.

**B.      Whether the Plaintiff has Stated Claims Under the FMLA or the DCFMLA**

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter."  29 U.S.C. § 2612(a)(1)(A).  In cases where a birth is "foreseeable," the Act requires that employees who exercise their right to leave because of the birth "provide the employer with not less than 30 days' notice, before the date of the leave is to begin."  Id. § 2612(e)(1).  However, "if the date of the birth . . . requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable."  Id.  The DCFMLA provides similar rights and notice obligations, although employees are entitled to "16 workweeks during any 24-month period."  D.C. Code §§ 32-502(a)(1), (f).  With certain exceptions, both the FMLA and the DCFMLA require that an employee returning from authorized leave be reinstated to the same position or an equivalent position as the one she had at the time that her leave commenced.  29 U.S.C. § 2614(a); D.C. Code § 32-505(d).

There are two types of claims for alleged violations of the FMLA.  First, the Act makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the Act.  § 2615(a)(1).  Second, the act makes it unlawful for an employer to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the Act, § 2615(a)(2), and further prohibits "any person" from "discharg[ing] or in any other manner discriminat[ing] against any individual" who, in connection with any proceedings or inquiries under the FMLA, "filed any charge or . . . instituted or caused to be instituted any proceeding"; "[gave], or is about to give information"; or "testified, or is about to testify," §§ 2615(b)(1)-(3).  Courts refer to these two types of claims respectively as "interference claims" and "retaliation claims."  See, e.g., Ghawanmeh v. Islamic

22

Saudi Acad., 857 F. Supp. 2d 22, 36 (D.D.C. 2012) (citing, among others, Breeden v. Novartis Pharm. Corp., 646 F.3d 43, 49-55 (D.C. Cir. 2011)).  The DCFMLA similarly provides for separate interference and retaliation claims.  See D.C. Code § 32-507.

### 1.    The Plaintiff's Retaliation Claims

FMLA and DCFMLA retaliation claims are analyzed under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under the McDonnell Douglas framework, a plaintiff "may establish a prima facie case creating a presumption of retaliation by showing '(1) that [s]he exercised rights afforded by the [FMLA], (2) that [s]he suffered an adverse employment action, and (3) that there was a causal connection between the exercise of [her] rights and the adverse employment action.'"  Roseboro v. Billington, 606 F. Supp. 2d 104, 109 (D.D.C. 2009) (second alteration in original) (citation omitted).  "For purposes of establishing a prima facie case of retaliation, 'temporal proximity can indeed support an inference of causation, but only where the two events are very close in time.'"  Hamilton v. Geithner, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (citation omitted).  If the plaintiff has successfully established a prima facie case, it follows that she has "state[d] a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), and it would thus be inappropriate to grant a motion to dismiss her claims.

As to the first element, the plaintiff argues, among other things, that her discussions with Lee and Mitchell during which she "object[ed] to the [April 7, 2011 Brown letter] and Howard's call for her ouster" constituted the requisite "opposition to a prohibited practice."  Pl.'s UDC Opp'n at 13 (citing Compl. ¶¶ 79, 83-89).  In the Title VII context, "protected activity encompasses utilizing informal grievance procedures, such as complaining to management or human resources about . . . discriminatory conduct."  Warner v. Vance-Cooks, __ F. Supp. 2d __,

__, 2013 WL 3835116, at *14 (D.D.C. 2013).  Indeed, "it is well settled that . . . informal, as well as formal, complaints" are protected under Title VII, <u>Richardson v. Guitierrez</u>, 477 F. Supp. 2d 22, 27 (D.D.C. 2007), and courts have held that informal complaints are protected under other similar anti-retaliation statutory provisions, as well, <u>see, e.g.</u>, <u>Barber v. CSX Distrib. Servs.</u> 68 F.3d 694, 702 (3d Cir. 1995) ("[W]e do not require a formal letter of complaint to an employer or the EEOC as the only acceptable indicia of the requisite 'protected conduct' under the [Age Discrimination in Employment Act].""); <u>Cooke v. Roskenker</u>, 601 F. Supp. 2d 64, 74 (D.D.C. 2009) (collecting cases from the First, Third, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits that held that the anti-retaliation provision of the FLSA protects informal complaints).  The Court sees no reason to treat FMLA retaliation claims differently.  The plaintiff's complaint clearly indicates that she had spoken with two human resources individuals at UDC, as well as with her own supervisor and that among other things, she discussed her concerns about being required to work while on FMLA leave.  <u>See</u> Compl. ¶¶ 86, 89.  She also expressed in an email to Mahone that she had not responded to an earlier email he had sent her because she was advised by someone in human resources that he would cease contacting her while she was on leave.  <u>See id.</u> ¶¶ 86-88.  These complaints sufficiently establish that the plaintiff engaged in activity protected by the FMLA and the DCFMLA.

The second element is satisfied here because, regardless of any other alleged employment actions, there is no dispute that the termination of the plaintiff's employment was an adverse employment action.

As to the third element, the issue presented is whether the facts plausibly suggest a causal connection between the exercise of her rights and the termination of her employment.  Given the short period of time between April 2011, when the plaintiff's leave commenced and when she

complained, albeit informally, about Mahone's interference with her DCFMLA and FMLA leave, and June 2011, when the plaintiff's employment was terminated, causation can be inferred, at least in part, from the temporal proximity of the two events. Hamilton, 666 F.3d at 1357-58. Indeed, this Circuit has recognized that a plaintiff established a prima facie case for retaliation under the FMLA where the plaintiff alleged that "[s]he planned to engage in statutorily protected activity (i.e. maternity leave); her employer took adverse action (she was fired); and there [was] evidence of a causal connection between these two events," where these two events were "sufficiently close in time" because they took place "only a few weeks" apart. Gleklen v. Democratic Congressional Campaign Comm., Inc., 199 F.3d 1365, 1368 & n.3 (D.C. Cir. 2000). Accordingly, the plaintiff has pleaded a prima facie case of retaliation under both the FMLA and the DCFMLA and the Court must therefore deny the defendants' motions to dismiss the plaintiff's retaliation claims.

### 2.     The Plaintiff's Interference Claims

"To state a prima facie claim of interference with any substantive right provided by the FMLA, an employee must demonstrate, by a preponderance of the evidence, that she was entitled to the right allegedly denied." Gaghan v. Guest Servs., Inc., No. 0301096HHK, 2005 WL 3211591, at *3 (D.D.C. Oct. 26, 2005) (citing Strickland v. Water Works & Sewer Bd., 239 F.3d 1199, 1206-07 (11th Cir. 2001); Bachelder v. Am. West. Airlines, Inc., 259 F.3d 1112, 1125 (9th Cir. 2001)).

Here, the plaintiff alleges that UDC approved her request for FMLA leave. See Compl. ¶ 73 ("UDC granted [the plaintiff] FMLA medical leave from on or about April 3, 2011, through on or about June 14, 2011."); see also id. ¶ 58 (discussing the plaintiff's request for DCFMLA leave). Nowhere does the plaintiff allege that her request to take FMLA leave was denied, or

that she was granted leave either for fewer weeks than she was entitled to take or for fewer weeks than she had requested.

However, the plaintiff does allege that she was denied her right to reinstatement because her position was terminated and she was not "restored to an equivalent position" with UDC or with Howard. See, e.g., Compl. ¶¶ 115-16, 128-29. And the FMLA and the DCFMLA make clear that employees who take authorized leave are entitled to reinstatement to the same or an equivalent position upon returning to work. 29 U.S.C. § 2614(a); D.C. Code § 32-505(d).

UDC argues, however, that the plaintiff has failed to state a claim for interference because she was no longer eligible for reinstatement "upon [Howard's] termination of the sub-grant." UDC's Dismiss Mem. at 11. Howard similarly argues that the plaintiff lost the right to reinstatement upon the termination of the sub-grant. Howard's Dismiss Mem. at 20-22. But the law is clear that while there is no right to reinstatement upon a lawful termination of employment, an unlawful termination cannot serve as a defense to an FMLA or DCFMLA claim. See Wash. Convention Ctr. Auth. v. Johnson, 953 A.2d 1064, 1078 (D.C. 2008) ("We cannot conclude that [an] . . . unlawful[] termination establishes a defense to the DCFMLA claim."); Hopkins v. Grant Thronton Int'l, 851 F. Supp. 2d 146, 155 (D.D.C. 2012) ("Rights to FMLA leave . . . do not protect an employee's job against a legitimate, unrelated, reason for separation from employment." (emphasis added) (citing cases from the Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Tenth Circuits)). Several federal courts "have concluded that an employer has the burden of proving that an employee dismissed during FMLA leave would have been dismissed regardless of the employee's request for leave." Id. at 156 (citing cases from the Eighth, Ninth, and Tenth Circuits); see also 29 C.F.R. § 825.216(a) ("An employer must be able to show that an

employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment.").

The plaintiff here alleges that UDC's sub-award and her employment were terminated because of her complaints, while the defendants contend that she was terminated solely because Howard terminated UDC's sub-award and would have done so regardless of the plaintiff's complaints. On this record dismissal of the plaintiff's interference claims would be inappropriate because there is a dispute as to the circumstances surrounding the plaintiff's termination. Indeed, as discussed above, the Court finds that the plaintiff has stated a cause of action for retaliation in violation of the FMLA and the DCFMLA, which in turn calls into question the legitimacy of her termination. The Court must therefore deny the defendants' motions to dismiss the plaintiff's FMLA and DCFMLA interference claims.

**C.      Whether the Plaintiff has Stated a Claim Under the DCHRA**

Under the DCHRA, it is "an unlawful discriminatory practice [for an employer] to" discharge an employee "wholly or partially for a discriminatory reason based upon the [employee's] actual or perceived: . . . sex . . . [or] family responsibilities." D.C. Code § 2-1402.11(a)(1). The Act explicitly states that claims for discrimination based on sex "include . . . discrimination on the basis of pregnancy, childbirth, or related medical conditions." Id. § 2-1401.05(a). The DCHRA further clarifies that "family responsibilities" refer to "the state of being, or the potential to become, a contributor to the support of a person or persons in a dependent relationship." Id. § 2-1401.02(12).

To establish a prima facie case of discrimination under the DCHRA,

a plaintiff must show that (1) she is a member of a protected class, (2) she suffered an adverse employment action, and (3) the unfavorable action gives rise

to an inference of discrimination, that is, an inference that her employer took the action because of her membership in a protected class.

Brown v. Dist. of Columbia, 919 F. Supp. 2d 105, 115 (D.D.C. 2013) (citing, among others, Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 850 (D.C. Cir. 2006)); see also Hamilton v. Howard Uni., 960 A.2d 308, 314 n.6 (D.C. 2008). A plaintiff's allegations create an inference of discrimination where they "'point to a worker'" outside of the plaintiff's protected class "'whose employment situation was nearly identical, but who was treated more favorably.'" Williams, 407 F. Supp. 2d at 6 (citation omitted).

It is undisputed that the plaintiff is a member of two protected classes. See, e.g., Compl. ¶ 131 ("[The plaintiff] was a member of a protected class because she is a female who required leave due to pregnancy and childbirth. [She] is also a member of a protected class because she has family responsibilities associated with caring for a newborn child who resides with her."); Howard's Dismiss Mem. at 22-23; UDC's Dismiss Mem. at 6-8. Nor is there any question whether the plaintiff's termination constituted an adverse employment action. See Compl. ¶ 98; Howard's Dismiss Mem. at 23; UDC's Dismiss Mem. at 6-8. The central issue then is whether "the unfavorable action gives rise to an inference of discrimination, that is, an inference that her employer took the action because of her membership in a protected class." Brown, 919 F. Supp. 2d at 115.

The plaintiff's allegations here are sufficient to raise an inference of discrimination. The complaint alleges that "other Service Centers had similar performance problems" as those experienced by the UDC Service Center "but were not placed on probation or subject to termination." Compl. ¶ 101. And the complaint contends that "[w]ith the exception of UDC, Howard renewed all of the Service Center sub-awards for 2012, despite their similar

performance records and contractual breaches." Id. ¶ 102. Most significantly, the plaintiff asserts that "[a]t least one other . . . Service Center had a vacancy in the position of Service Center Director and Small Business Advisor for a substantial period of time." Id. ¶ 134; see also id. ¶¶ 53-54 (discussing a vacancy in the Service Center Director position at the D.C. Chamber of Commerce Service Center beginning in January 2011, and alleging that the Chamber of Commerce Service Center "referred clients to other Service Centers" during the pendency of the vacancy); id. ¶ 77 ("As of April 7, 2011, other . . . Service Centers were seriously deficient in meeting their goals and also had experienced extended vacancies in both the Director and Business Advisor positions but they were not placed on probation."). Neither Howard nor UDC disputes these allegations. When these allegations are considered along with the statements in the Brown letter that appear to equate the plaintiff's maternity leave with "abandon[ing] the [UDC] [S]ervice [C]enter and its clients," as well as the fact that these statements were followed by a suggestion that the plaintiff should be terminated from her position as part of an effort to improve the functioning of the UDC Service Center, the Court finds that the plaintiff's allegations are sufficient collectively to raise an inference of discrimination under the DCHRA. Accordingly, the Court will deny the defendants' motions to dismiss the plaintiff's DCHRA claim.

**D.      The Plaintiff's Motion for Leave to Amend Her Complaint**

The plaintiff seeks "leave to amend her Complaint to clarify issues of [her] joint employment and to add a fourth count for gender discrimination under Title VII." Pl.'s Mem. ¶ 7. The defendants oppose the amendments on two grounds. They first argue that the amendments would be futile because the plaintiff's new allegations would fail to state a claim. UDC's Opp'n at 3; Howard's Opp'n at 7-12. Second, the defendants contend that the

amendments would be futile because the plaintiff's failure to file the claim within the ninety-day

filing period requirement of Title VII bars her claims from consideration as a matter of law.

UDC's Opp'n at 4; Howard's Opp'n at 12-15.

Because the Court has denied the defendants' motions to dismiss the plaintiff's DCHRA

claims, and because "DCHRA claims are generally scrutinized under the same legal framework

used by courts to analyze claims under Title VII," Konah, 815 F. Supp. 2d at 71, the Court

rejects the defendants' arguments about the futility of the new allegations.

As to the question of timeliness, it is well established that "[t]he filing time limit imposed

by Title VII, 42 U.S.C. § 2000e-16(c), 'is not a jurisdictional requirement but rather is similar to

a statute of limitations.'" Colbert v. Potter, 471 F.3d 158, 167 (D.C. Cir. 2006) (citation

omitted). The ninety-day filing limit is thus "'subject to . . . equitable tolling.'" Id. (citation

omitted). Courts "'have allowed equitable tolling in situations where the claimant has actively

pursued [her] judicial remedies by filing a defective pleading during the statutory period, . . .

[but] have generally been much less forgiving in receiving late filings where the claimant failed

to exercise due diligence in preserving [her] legal rights.'" Wiley v. Johnson, 436 F. Supp. 2d

91, 96 (D.D.C. 2006) (quoting Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990)). And

"to apply equitable tolling, the plaintiff must have exercised due diligence and h[er] excuse for

the delayed filing must be 'more than a garden variety claim of excusable neglect.'" Id. (citation

omitted).

The plaintiff here "'has actively pursued [her] judicial remedies by filing a defective

pleading during the statutory period.'" Wiley, 436 F. Supp. 2d at 96 (citation omitted).

Specifically, she filed her amended complaint on August 27, 2012, which was within the Title

VII ninety-day filing period, but doing so was improper and ran afoul of Federal Rule of Civil

Procedure 15 because she failed to first obtain the defendants' consent or seek leave of the Court. See Howard's Consent Mot. at 1. She thus withdrew her amended complaint, see Pl.'s Withdraw Mot. at 1; September 14, 2012 Minute Order (granting the plaintiff's motion to withdraw), and thereby lost the benefit of filing within the statutorily required period.

However, the defendants were on notice that the EEOC had issued the plaintiff a Dismissal and Notice of Rights. Pl.'s Mem. ¶ 4. And both defendants first consented to the plaintiff's motion to withdraw her amended complaint, see Howard's Consent Mot. at 1; UDC's Consent Mot. at 1, but now argue that the withdrawal of the amended complaint has barred the plaintiff from alleging any claims under Title VII. Considering the plaintiff's attempt to file her amended complaint within the Title VII ninety-day filing period, the absence of any evidence of bad faith on the part of the plaintiff, and the fact that both defendants were on notice of the claims, and thus cannot claim that they would somehow be prejudiced by the filing of the amended complaint, the Court finds that equitable tolling is appropriate in this situation.

Accordingly, because courts should grant leave to amend "freely," Fed. R. Civ. P. 15(a), and because the circumstances here do not suggest the presence of "undue delay, bad faith, undue prejudice to the opposing party, repeated failure to cure deficiencies, or futility," Richardson, 193 F.3d at 548-49, the Court grants the plaintiff's motion to amend her complaint.

## IV. CONCLUSION

For the foregoing reasons, the Court denies the defendants' motions to dismiss and grants the plaintiff's motion to amend her complaint.[7]

---

[7] The Court will contemporaneously issue an Order consistent with the Memorandum Opinion.

**SO ORDERED** this 30th day of October, 2013.

REGGIE B. WALTON
United States District Judge