

Daniel I. Pryves
Direct: 202/508-6094
Fax: 202/220-7394
daniel.pryves@bryancave.com

April 28, 2014

The Honorable Reggie B. Walton
Judge, United States District Court
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

Re:   *Candice Miles v. University of the District of Columbia, et al.*, Case No. 1:12-CV-
       00378 (RBW)

Dear Judge Walton:

    We are counsel to defendant Howard University in the above-captioned case.

    During the conference call on Friday, April 25, 2014, counsel for Plaintiff
Candice Miles and Howard University discussed with the Court Plaintiff's request
that the independent mental health examination of Plaintiff (scheduled for May 3,
2014) be tape recorded.

    The Court expressed interest in receiving from the examining psychologist --
Dr. Nicole Alford – An affidavit or declaration explaining the basis for her
opposition to tape recording.  Dr. Alford's declaration is attached.

    In addition, we would like to call to your attention two court decisions in the
District of Columbia addressing the subject of tape-recording.  They are:  Chiperas v.
Rubin, Civ. A. 96-130(TPJ), 1998 WL 765126, at *5 (D.D.C. Nov. 3, 1998) (Judge
Facciola) ("In the absence of some reason to believe that competent medical
professionals can be expected to misrepresent what occurred during a psychiatric
evaluation, the need for a technically perfect record yields to the potential harm to be
done if the presence of a stenographer or tape records inhibits the interviewee's
discussion of what have to be matters he might well prefer to keep to himself")
(copy attached); and Abdulwali v. WMATA, 193 F.R.D. 10, 13-14 (D.D.C. 2000)
(denying request to tape record examination based on examining psychiatrist's
statement that the presence of recording devices "is inimical to the success of such an
examination because it/they distort psychological openness and spontaneity").

Bryan Cave LLP
1155 F Street, NW
Washington, DC 20004
Tel (202) 508-6000
Fax (202) 508-6200
www.bryancave.com

Bryan Cave Offices

Atlanta
Boulder
Charlotte
Chicago
Colorado Springs
Dallas
Denver
Frankfurt
Hamburg
Hong Kong
Irvine
Jefferson City
Kansas City
London
Los Angeles
New York
Paris
Phoenix
San Francisco
Shanghai
Singapore
St. Louis
Washington, DC

Bryan Cave
International Consulting
A TRADE AND CUSTOMS CONSULTANCY

www.bryancaveconsulting.com

Bangkok
Jakarta
Kuala Lumpur
Manila
Shanghai
Singapore
Tokyo

Bryan Cave LLP

Hon. Reggie B. Walton
April 28, 2014
Page 2

Thank you for Your Honor's consideration of this issue.

Sincerely,

Daniel I. Prywes
Counsel for Defendant Howard University


Attachments

cc (via email and first-class mail):
      Nicholas Woodfield, Esq. (w/atts.)
      Yoora Pak, Esq. (w/atts.)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CANDICE MILES,

                        Plaintiff,

          v.

UNIVERSITY OF THE DISTRICT OF
COLUMBIA, et al.,

                        Defendants.

**Case No. 1:12-CV-00378 (RBW)**

## DECLARATION OF NICOLE M. ALFORD, PH.D.

I, NICOLE M. ALFORD, Ph.D., do hereby declare and say:

1.      I am over the age of 21, and competent to give this Declaration.

2.      I am a licensed psychologist, with extensive experience in forensic psychology. My curriculum vitae is attached as Exhibit A. As noted there, I worked for six years at the Superior Court of the District of Columbia, and have previously been retained as an expert witness by the U.S. Department of Justice/Office of the Attorney General, D.C. Public Defender's office, and have been admitted as an expert in federal and state courts. Since 2006, I have served as an adjunct professor of Clinical and Forensic Psychology and have taught a number of graduate level courses in Personality Assessment and Forensic Assessment at both Argosy (American School of Professional Psychology) and American Universities.

3.     I have been asked by counsel for defendant Howard University to conduct an independent mental health evaluation of Ms. Candice Miles, who is the plaintiff in this litigation. At the assessment session, I plan to conduct a clinical interview with Ms. Miles, and administer written psychological tests.

4.     I understand that Ms. Miles' attorney has requested that the assessment session be tape recorded. In my professional opinion, such tape recording would interfere with my ability to conduct a valid and reliable assessment of Ms. Miles' condition, mental health history, and issues of causation.   There are several reasons for my opinion, as well as some ethical concerns outlined below.

5.     First, it is important in any psychological assessment for the examiner to establish rapport with the subject, notwithstanding the fact that, in this case, the examination is for use in legal  proceedings.  The presence of a tape recorder introduces an additional confrontational element into the environment, increasing the caution on the part of the subject to measure her words especially carefully.  More generally, the presence of a tape recorder is likely to alter a subject's behavior.  Some subjects may be more inhibited in disclosing sensitive and/or emotional personal matters.  Spontaneity and candor may be reduced.  Other subjects may feel that they need to amplify certain points, to create a better record for the tape recorder.   These effects involve what is called "reactivity;" namely the tendency of behavior to change when and because it is under observation.  By excluding a tape recorder, these effects can be avoided.

6.     Second, the professional literature recognizes these concerns. In 2007, the
American Psychological Association issued a Statement on Third Party Observers in
Psychological Testing and Assessment, which is attached as Exhibit B. The Statement cites
several scientific studies, and concludes that "[e]xaminees who are aware that their assessment is
being recorded, either in audio only or in combined audio and video, may alter their assessment
behavior." (Exhibit B, at 2.) This phenomenon could also have an unknown impact on
standardized written psychological tests, since the normative group used for scoring was not
subject in any way to audiotaped recording.

7.     Third, standardized assessment procedures form the basis for the examiner's
confidence in the inferences drawn from the totality of the data (including that derived from the
clinical interview). The introduction of any non-standardized element (such as an
audiorecording device), introduces an uncontrolled variable and represents a deviation from the
standard of practice. Confidence in the conclusions drawn will be adversely impacted under
such conditions.

8.     Fourth, per Section 9.11 of the American Psychological Association's Ethical
Principles of Psychologists and Code of Conduct, psychologists are required to maintain test
security; part of which entails keeping in strict confidence the questions used in written
examinations as well as the verbal instructions given prior to test administration. This is done so
that the integrity of the test is not compromised in a way that allows future examinees to prepare
for the test. The tape recording of the examination could compromise test integrity and security
since the test instructions are no longer within the control of a licensed, trained professional.
Furthermore, agreements with test publishers also require that only trained psychologists have

3

access to test instructions and questions, which are copyrighted and in many cases trade protected material.

9.     As is standard, I plan to take comprehensive notes during my assessment of Ms. Miles for my own use, and those notes can be made available afterwards to both parties' counsel if the Court so orders.

10.    In keeping with my profession's Ethical Guidelines, if the Court should decide to order the tape recording of the assessment session despite my concerns, for protection of test security I would request the Court to order that there be no tape recording of the written testing portion of the examination and any associated instructions.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 28, 2014.

Nicole M. Alford, Ph.D.

4

EXHIBIT A

N.M. Alford, Ph.D.
*Vita* 1

*CURRICULUM VITA*

# NICOLE M. ALFORD, Ph.D.
## Clinical-Forensic Psychologist

Office:
11350 Random Hills Road
Suite 800
Fairfax, Virginia 22030
*Office:* (703) 934-6000
*Facsimile:* (703) 327-5248
*Mobile:* (301) 346-1943

E-mail: NMAlford@aol.com

Occupation:          Clinical-Forensic Psychologist

*With specialties in criminal and civil forensic psychologies, psychological assessment of adults, adolescents and children, personnel selection, independent medical evaluations, trial consultation, expert testimony, seminars, workshops and other services.*

Professional Licensure: Maryland License No. 03575 (Psychologist)
District of Columbia License No. PSY1000038 (Psychologist)
Virginia License No. 0810004596 (Psychologist)
*All licenses are active and unrestricted*

## EDUCATION AND CLINICAL TRAINING:

1997 to 1998          **D.C. Commission on Mental Health Services**
**St. Elizabeths Hospital**
Washington, D.C.

John Howard Pavilion
*Postdoctoral Fellowship in Clinical Forensic Psychology*

1996 to 1997          **United States Department of Justice/**
**Federal Bureau of Prisons**
Federal Correctional Institution
Butner, North Carolina

*Doctoral Internship in Clinical and Forensic Psychology*
*(Accredited by the American Psychological Association)*

1992 to 1997          **State University of New York at Buffalo**
Buffalo, New York

Degree: Doctor of Philosophy, September 1997
Major: Counseling Psychology (APA Accredited)
*Dissertation:* African-American women's self-esteem
as a function of skin color: A quasi-qualitative
approach
Chair: Thomas T. Frantz, Ph.D.

N.M. Alford, Ph.D.
*Vita* 2

*Thesis:* Knowledge of and attitudes toward female victims of rape:
A study of counselors-in-training
Chair: Barbara A. Putnam, Ph.D.

1991 to 1992 **Teachers College, Columbia University**
New York, New York

Ed.M. program in Psychological Counseling

1986 to 1991 **State University of New York at Buffalo**
Buffalo, New York

Degree: Bachelor of Arts, *with High Distinction*
Double Major: Psychology and Social Sciences Interdisciplinary
Concentration: Community Mental Health

## PROFESSIONAL EXPERIENCE

2005 to Present Alford Psychological Consulting, LLC
Fairfax, Virginia
*www.AlfordPsych.com*

**Title:** CEO & President

This psychological consulting company specializes in providing comprehensive
psychological assessment and consultative services with an emphasis on various
psycho-legal issues. Expertise includes evaluations for personnel selection for
sensitive positions, fitness for duty evaluations, child custody/visitation disputes,
parenting capacity assessments, independent medical evaluations, evaluations of
competency to stand trial and criminal responsibility, risk assessments, and
various evaluations of children and adolescents, including psychosexual and
psychoeducational evals. Provide expert testimony in these cases. Current/
previously held contracts include: U.S. Department of Defense, Maryland
Department of Juvenile Justice, Fort George G. Meade Police Department, U.S.
Attorney General's Office, and Public Defender Service, among others.

2000 to March 2006 Superior Court of the District of Columbia
Child Guidance and Family Counseling Clinic
Washington, D.C.

**Title:** Staff Psychologist
**Duties:**
· Performed court-ordered psychological evaluations of children, adolescents, and
adults who come to the attention of the Family Court. Types of evaluations
included assessments of children in the abuse/neglect system, assessment of
trauma, parenting capacity, child custody evaluations, prediction of
dangerousness/risk assessments of juvenile delinquents, assessing juveniles'
suitability for transfer to adult court, sex-offender risk assessments,
competency to stand trial, psychoeducational assessments, and juvenile
rehabilitation evaluations in which I provided recommendations for
disposition, placement, educational and/or mental health services.
· Provided expert testimony to the Court in these cases.
· Supervised the training of doctoral-level interns and externs in this APA
accredited internship program.
· Co-conducted Forensic Seminar for psychology interns.
· Member of the Psychology Training Committee.

N.M. Alford, Ph.D.
*Vita* 3

·Represented the Court in various jurisdictional and interagency mental health
    committees and initiatives
·Provided staff training to the Social Services Division and Superior Court staff.

**Title:** Supervisor – Domestic Relations Unit
**Duties:**
·Provided clinical and administrative supervision to the Domestic Relations Unit,
    which performs comprehensive evaluations of families party to a child
    custody/visitation dispute, and renders recommendations.
·Reviewed and approved all evaluations.
·Responsible for hiring, transferring, and evaluating employees.
·Responsible for budgetary and resource allocations.
·Provided training to the judiciary on the function of this Unit.
·Conducted monthly case conference.
·Responsible for employee training and continuing education.

1999 to Present      <u>Greenside Psychological Services and Atlantic Occupsych</u>
         Towson, Maryland

         **Title:** Consultant
         **Duties:** Specialize in occupational psychology, personnel selection, and forensic
         assessment. Perform pre-employment evaluations for law enforcement
         applicants for Frederick County Police and Fire Departments, Anne Arundel
         County Police and Fire Departments, Maryland National Park and Planning
         Commission, Drug Enforcement Administration, and Amtrak Police Department,
         among other agencies. Provide on-call crisis services for critical incident
         debriefing of Anne Arundel County Police Officers. Perform pre-sentencing
         evaluations of detainees and/or probationers of the Maryland Department of
         Corrections.

1998 to 2000        <u>Clifton T. Perkins Hospital Center</u>
         Psychology Department
         Jessup, Maryland

         **Title:** Staff Psychologist
         **Duties:** Co-administrated a maximum-security ward consisting of 30 pre- and
         post-trial detainees, jail transfers, and civilly committed patients. Conducted
         court-ordered pretrial evaluations assessing competency to stand trial and/or
         criminal responsibility, psychological evaluations for diagnostic and treatment
         clarification, risk assessments, treatment and discharge planning, writing and
         administering specialized behavior plans, conducting weekly competency/legal
         issues groups, individual and group psychotherapy, and overseeing the ward's
         privilege level system. Provided court testimony. Conducted new staff
         orientation on the implementation of specialized behavior plans. Provided on-
         going training to nursing staff on the Hospital's privilege level system.

## TEACHING/TRAINING EXPERIENCE

Fall 2006 to Present     Argosy University
         Washington, D.C.

         Teach graduate course in Personality Assessment to doctoral level clinical
         psychology students.

Spring 2002 to 2004     American University
         Washington, D.C.

N.M. Alford, Ph.D.
*Vita 4*

|  | *Adjunct Professor of Psychology – Psychology Department* |
|---|---|
|  | Teach graduate courses in intellectual and personality assessment and forensic psychology to doctoral level clinical psychology students. |
| September 2000 to 2006 | Superior Court of the District of Columbia **Title:** Forensic Assessment Seminar |
|  | Present at weekly seminar for pre-doctoral interns on various aspects of forensic assessment and forensic psychology. Includes case presentation. |
| January 1999 to 2005 | Prince George's County Community College Largo, Maryland |
|  | *Adjunct Professor of Psychology - Psychology Department* |
|  | Teach undergraduate level psychology courses (General Psychology, Personality and Adjustment, Forensic Psychology). Developed and teach Forensic Psychology course conjointly for the Forensic Sciences and Psychology Departments. |
| June 1999 to 2000 | Clifton T. Perkins Hospital Center |
|  | Provide training on the rationale and implementation of specialized behavior plans for all new staff members. |
| October 1996 & May 1997 | Federal Correctional Institution at Butner |
|  | **Title:** Pre-release Training: Communication Skills Taught class consisting of approximately 80 inmates awaiting release on the importance of verbal and nonverbal communication, cultural differences in communication, and communication styles. |
| Spring 1996 | University Residence Halls State University of New York at Buffalo |
|  | **Title:** Diversity Training Series Instituted and taught weekly seminar consisting of 16 Resident Advisors on multicultural awareness, cultural pluralism and culturally diverse programming. Included lectures, discussions, and projects. |
| Spring 1996 | University Residence Halls State University of New York at Buffalo |
|  | **Title:** What's the 411? Crisis Counseling in the Residence Halls In-service training to 40 University Resident Advisors on identifying and responding to crises within the Residence Halls. Included lecture, discussions, and role-plays. |

## COMMITTEE PARTICIPATION

| February 2001 to 2005 | Juvenile Interagency Mental Health/Substance Abuse Task Force Superior Court of the District of Columbia |
|---|---|

N.M. Alford, Ph.D.
*Vita* 5

| July 2000 to 2006 | Psychology Training Committee<br>Superior Court of the District of Columbia |
| January 1999 to May 2000 | Psychology Training Committee<br>Clifton T. Perkins Hospital Center |
| February 1999 to May 2000 | Behavior Intervention Team<br>Clifton T. Perkins Hospital Center |
| March 1998 to March 1999 | Resident's Rights Committee<br>Clifton T. Perkins Hospital Center |

## PUBLICATIONS & PAPER PRESENTATIONS

Alford, N.M. (2009, March). Assessing credibility of child victims, witnesses, and defendants. Guest lecture presented at the Annual Louisiana Judicial College, Lafayette, Louisiana.

Barnes, M.E. & **Alford, N.M.** (2004, August). The clinical/forensic assessment of juveniles: Conducting culturally competent assessments. Workshop presented at the 36th Annual Convention of the Association of Black Psychologists, Washington, D.C.

Barnes, M.E. & **Alford, N.M.** (2004, August). The disparities in the juvenile justice system: Entrance, disposition and treatment. Panel discussion presented at the 36th Annual Convention of the Association of Black Psychologists, Washington, D.C.

Alford, N.M., Barnes, M.E., Hugonnet, M.H., Adamo, S.A., & Donnelly, M.M. (2004, June). Psychological testing: A primer for lawyers. Workshop presented at the American Bar Association and American Psychological Association's National Conference on Children and the Law, Washington, D.C.

Henning, K., Barnes, M.E., **Alford, N.M.**, & Ratner, R. (2004, June). Evaluation of a youth's amenability to rehabilitation: Implications for delinquency and waiver to adult court. Panel discussion presented at the American Bar Association and American Psychological Association's National Conference on Children and the Law, Washington, D.C.

Barnes, M.E., **Alford, N.M.**, & Adamo, S.A. (2003, June). Potentially violent juveniles: Assessment and considerations. Workshop presented at the Annual Convention of the Mid-Atlantic States Correctional Association, Atlantic City, NJ.

Alford, N.M., Barnes, M.E. & Donnelly, M.M. (2002, May). DSM-IV diagnoses in children and adolescents: Disorders commonly seen in juvenile populations. Workshop presented at the Annual Convention of the Mid-Atlantic States Correctional Association, Dover, DE.

Alford, N.M., Barnes, M.E., Adamo, S.A. & Donnelly, M.M. (2001, June). The use of the DSM-IV in forensic and correctional settings. Workshop presented at the Annual Convention of the Mid-Atlantic States Correctional Association, Washington, D.C.

N.M. Alford, Ph.D.
*Vita* 6

Alford, N.M. (1994). <u>Chronic mentally ill patients at a state psychiatric facility: A look at perceived treatment and care.</u> Unpublished manuscript.

Alford, N.M. (1994, October). <u>Knowledge of and attitudes toward female victims of rape: A study of counselors-in-training.</u> Paper presented at the annual Counseling And Educational Psychology Departmental Research Symposium, State University of New York at Buffalo, Buffalo, New York.

Alford, N.M. (1994, August). <u>Knowledge of and attitudes toward female victims of rape.</u> Paper presented at the Annual Convention of the American Psychological Association, Los Angeles, CA.

## HONORS

1996            Mark Diamond Research Grant - State University of New York at Buffalo
               *Successfully wrote grant proposal and secured full funding for dissertation research.*

1992 to 1996    Arturo A. Schomburg Graduate Fellowship- State University of New York
               *Awarded full four-year fellowship for doctoral studies.*

## SERVICE ORGANIZATIONS

Bridges Community Development Center – Anne Arundel County, MD
Member – Board of Directors

Alpha Kappa Alpha Civic & Service Sorority, Inc.
(Member since 1987)

EXHIBIT B

# Statement on Third Party Observers in Psychological Testing and Assessment: A Framework for Decision Making

Committee on Psychological Tests and Assessment
American Psychological Association

This Statement does not constitute an official policy of the American Psychological Association (APA), does not purport to dispense legal advice, and is not intended to establish standards or guidelines for conduct by practitioners. The statement may prove useful in analyzing and responding to situations in which third parties request to be present, either in person or by electronic proxy, at the time that psychological evaluations are conducted.

## INTRODUCTION

Psychologists occasionally receive requests that observers be allowed to witness or record the administration of a psychological evaluation. An evaluation is broadly defined as a standardized or non-standardized observation, interview, or test. An evaluation may occur in any number of clinical, educational, employment, and forensic contexts. For example, attorneys may desire to obtain additional information about the processes contributing to the formation of an expert psychological opinion. Examinees may attempt to condition their participation in an evaluation upon the presence of a trusted friend or relative. Professors and supervisors may seek to provide qualified students or trainees with an in vivo demonstration of advanced evaluation techniques. Hence, the observer may be a psychologist or trainee and, in such cases, all the same issues and concerns apply. The styling of and motivation behind requests to observe psychological assessment and testing are as varied and multifaceted as the purposes, settings, and conduct of the assessments themselves.

The primary purpose of this Statement is to provide psychologists with information to assist them in (a) reaching a conclusion concerning the appropriateness of observation of psychological evaluations, (b) conveying the scientific and professional bases for such a conclusion, and (c) identifying options in light of such a conclusion, with sensitivity to the particular source and substance of a request for observation and the specific nature and circumstances of the assessment in question. A secondary purpose is to inform and educate nonpsychologists regarding these issues and the consequences of such observations.

Psychologists need to be aware of relevant ethics code provisions regarding uses of assessment to facilitate valid results (see Section 9 of the APA Ethics Code). Psychologists enhance the validity of evaluation results by adhering to standardized procedures (when the techniques they use outline standardized administration procedures) and by developing and sustaining rapport with the examinee. In most testing manuals, standardized procedures and recommended practices for developing and sustaining rapport specify that only the psychologist and the examinee are present in the assessment setting. However, in some cases, the presence of a third party may help develop and sustain rapport in order to facilitate validity. Examples of such cases include the use of sign or voice language interpreters, an assistant or aide to support physical accessibility, or the inclusion of a caregiver for an examinee

This document is the product of over 7 seven years of American Psychological Association (APA) volunteer and staff effort. The Committee on Psychological Tests and Assessment (CPTA) and the Science Directorate wish to thank current and former members of CPTA for their efforts in conceiving, drafting, and producing this document. In addition, the members of CPTA wish to extend special appreciation to the APA's Committee on Legal Issues for their thoughtful critique and suggestions for improvement of earlier drafts. Correspondence concerning this article should be addressed to the Science Directorate, Office of Testing and Assessment, 750 First St. NE. Washington, DC 20002-4242.

whose ability to perform may be significantly impaired when the examinee is separated from the caregiver. Another example is the case of an immigrant from a substantially different culture who may not feel comfortable with one-on-one testing. In addition, the question of an observer may be introduced by psychologists in an effort to address questions of the validity of the assessment process. Specifically, if the validity of the evaluation may be compromised without a third party observer, the psychologist may want to consider requesting that a third party observer be present (e.g., a parent). In all of these situations, the psychologist may want to take steps (discussed later) to ensure that the presence of the third party facilitates or affects minimally the validity and fairness of the assessment.

## ASSESSMENT ISSUES

The use of uniform, standardized evaluation procedures is one of the fundamental canons upon which psychological assessment and testing is founded (American Educational Research Association, American Psychological Association, & National Council on Measurement in Education [AERA, APA, NCME], 1999). Failure to adhere to requisite data gathering procedures may compromise the validity of inferences made from these observations (cf. Anastasi & Urbina, 1997; Sattler, 2001, 2006). Research in social psychology demonstrates that individuals' behavior frequently changes in the presence of a third party (e.g., Chekroun & Brauer, 2002). Therefore, there is substantial reason to suspect that the inclusion of a third party in an assessment may influence the examinee's behavior.

The effects of observation upon an examinee's test performance may vary as a function of the identity of the observer, the purpose of observation, the manner of observation, the assessment instruments involved, the examinee's sensitivity to observation, and many other factors. Because psychological assessment procedures and tests typically are not standardized using scores obtained in the presence of third party observers, observation or surveillance may violate the conditions of standardization. Moreover, negative effects of observation on test performance may impair the validity of routine test interpretation strategies (e.g., Binder & Johnson-Greene, 1995; Isaacs & Chen, 1990;

Kehrer, Sanchez, Habif, Rosenbaum, & Townes, 2000; Lynch, 2005; Lynch & McCaffrey, 2004; McCaffrey, Fisher, Gold, & Lynch, 1996; McSweeny et al., 1998; Masling, 1960; Sattler & Theye, 1967). Recent studies of neuropsychological evaluations indicate that the presence of observers increases performance errors and false positives on the measures used (Constantinou, Ashendorf, & McCaffrey, 2006; Gavett, Lynch, & McCaffrey, 2006; Lynch, 2005). One neuropsychological study suggests that negative effects may occur even in cases where the psychologist requests, and the examinee consents to, observation—such as when a clinical supervisor observes a supervisee conducting an assessment (Yantz & McCaffrey, 2005).

Because some examinees may be less likely to share personal information if they believe that others are observing or could observe their actual statements or behavior (e.g., Sattler, 1998), the validity of nonstandardized or non-test assessment procedures, such as interviews or observations, may also be affected by the perceived or actual presence of a third party. For example, one study suggests that interviews conducted in the presence of a third party may elicit qualitatively or quantitatively different (though not necessarily invalid) responses than those conducted in the absence of a third party (Podmore, Chaney, & Golder, 1975).

Psychologists may also want to consider carefully the issues involved in recording evaluations for observation by third parties not present during the testing. Examinees who are aware that their assessment is being recorded, either in audio only or in combined audio and video, may also alter their assessment behavior (Constantinou, Ashendorf, & McCaffrey, 2005). Although surreptitious observation and recording (in which the examinee is unaware of the observation) may minimize the examinee's reactivity to observation, surreptitious surveillance may also raise ethical (e.g., APA, 2002; AERA, APA, NCME, 1999) and legal issues regarding the psychologist's obligation to disclose to the examinee the fact that the session is being observed or recorded and the identity of individuals who may have access to the observation or recording.

With regard to test security and potential misuse of tests, the cautions that apply in allowing observation

or recording of test administrations by unqualified individuals are essentially the same as those that have been presented in reference to the disclosure of test data (cf. American Academy of Clinical Neuropsychology, 2001; Committee on Legal Issues, 2006; Committee on Psychological Tests and Assessment, 1996a, 1996b; National Academy of Neuropsychology, 2000a, 2000b). These sources indicate that by creating a retrievable record of test items and responses and by making this record available to nonpsychologists, the security of test materials and the copyright may be compromised. Information contained in that record may also be subject to misuse. For example, observers who learn the specific item content of psychological tests could potentially use this information to "coach" or otherwise prepare subsequent clients (Cato, Brewster, Ryan, & Giuliano, 2002; Rosen, 1995; Victor & Abeles, 2004; Youngjohn, 1995).

Given that validity and test security may be compromised when third parties are allowed to observe or otherwise survey the process of test administration, some have proffered specific recommendations against allowing third party observation (e.g., American Academy of Clinical Neuropsychology, 2001; Anastasi & Urbina, 1997, p. 13; Duff & Fisher, in press; National Academy of Neuropsychology Policy and Planning Committee, 2000a; Sattler, 1988, p. 109; Wechsler, 1997a, p. 29; Wechsler, 1997b, p. 30). However, other research also indicates that in some situations failure to include a third party may undermine the validity of assessment results. These situations are guided by the principle of ensuring access to the assessment setting for the examinee. There are important differences between access skills (i.e., skills and capabilities needed to comprehend and respond to the assessment) and target skills (i.e., the skills and capabilities that are the focus of the assessment). Barriers posed when examinees do not have prerequisite access skills (e.g., linguistic comprehension and expression, the physical ability to see or physically access materials, the emotional security needed to engage in cognitive processes) should be either removed or controlled as best as possible, while concurrently retaining the target skills demanded in the assessment. In some cases, access is facilitated through physical changes to the assessment environment (e.g., wheelchair accessible furniture, use of large print materials). In other cases, access is facilitated by a third party (e.g., voice or sign language interpreters, physical assistants, and caregivers to reduce anxiety). Psychologists may initiate a request to include a third party when, in their judgment, such inclusion would reduce barriers posed by access skills without altering the target skills demanded in the assessment.

## POTENTIAL OPTIONS

In those situations in which psychologists are faced with requests for observation or participation of a third party, they may wish to consider one or more of the following options, when such options are both ethical and practical in the context of the particular assessment in question:

1. Conduct the Evaluation in the Presence of a Third Party Observer

   In some instances, the psychologist may conclude that the assessment can be conducted with an observer in a way that would neither impair the validity or fairness of the evaluation and findings, nor raise ethical or legal problems. When a request for such an assessment is accepted, it may be appropriate to consider ways to minimize the impact of observation on the validity and fairness of the evaluation. Such steps include, but are not limited to, seating the observer behind the examinee and ensuring the observer consents to not speaking or otherwise influencing the examinee during the assessment. In cases in which the psychologist decides that participation of a third party in a role other than observing will facilitate the validity and fairness of the assessment, the psychologist may work with that party to ensure that their participation facilitates and does not undermine or impair the assessment. It may be useful for the psychologist to inform the examinee that the results of the evaluation may be altered by the process when seeking the examinee's consent to be observed and to document this potential limitation in the report.

### 2. Minimize the Intrusion Afforded by Observation

If third parties request to observe or record an evaluation session, the psychologist may request that the observation occur in the least intrusive fashion reasonably available (e.g., through a one-way mirror as opposed to the actual presence of the observer in the testing room). For example, if the assessment and/or test administration is to be recorded, an audio recording may be less intrusive than a video recording. When recordings are made, the psychologist may want to take steps to limit the availability of such recordings to individuals not immediately involved with the evaluation. For example, for evaluations that take place in the context of litigation, a protective order from the judge may be obtained, obligating all parties to maintain test security and to destroy the recordings at the conclusion of legal proceedings. In forensic or other legally indicated contexts, psychologists may wish to document and assist in clarifying the reasons for which observation was ultimately permitted.

Provisions for the safekeeping, maintenance, and proper disposal of such records may be addressed via consultation with existing sources of scientific and professional guidance (e.g., COLI, 2006; Committee on Professional Practice & Standards, 1993; CPTA, 1996). Alternative approaches should take into account measures to avoid compromising the validity or fairness of the assessment.

### 3. Utilize Assessment Measures Less Affected by Observation

If observation is to occur, the employment of assessment measures less affected by observation may be appropriate. Observation of these alternative assessment approaches may be less intrusive to examinees. The purpose of choosing alternative instruments and/or methods is to help decrease the potential reduction of reliability and validity of the evaluation. However, there may be no psychometrically equivalent test instrument or procedure that provides the same quality of data, which may obviate these alternatives.

### 4. Recommend That the Request for Observation be Withdrawn

Psychologists may decide to inform the requesting party of the potentially deleterious influence of third parties upon a particular evaluation situation. If the request comes from an attorney or a court of law—perhaps even in the form of a court order—psychologists may file an affidavit with the court, or serve as a resource for an attorney seeking to file such an affidavit, to inform the court of the reasons why observation may be inadvisable. Under some circumstances, the request for inserting a third party into the assessment may be withdrawn. In some cases, judges have ruled in favor of following a strict evaluation and test administration protocol, specifying the exclusion of third parties (see McCaffrey et al., 1996).

### 5. Decline to Perform the Assessment Under Observation

If psychologists are unable to resolve observation issues to their satisfaction (e.g., a third party observer is requested to be present, but the psychologist has concluded that such presence could affect the validity and fairness of the evaluation), the psychologist may decide to decline to conduct the assessment even if such observations are required by law. They may choose to cite in this regard the possibility that the validity of certain assessment procedures would be compromised by the presence of the third party observer.

## DOCUMENTING OBSERVATION AND THIRD PARTY PARTICIPATION

Psychological assessments where a psychologist permits observation by, or participation of, a third party, need to document the observation by the third party. The provisions of Standard 9.06 of the *APA Ethical Principles and Code of Conduct* may be relevant. Standard 9.06 provides as follows:

> When interpreting assessment results, including automated interpretations, psychologists take into account

the purpose of the assessment as well as the various test factors, test-taking abilities, and other characteristics of the person being assessed such as situational, personal, linguistic, and cultural differences, that might affect psychologists' judgments or reduce the accuracy of their interpretations. They indicate any significant limitations of their interpretations.

## CONCLUSION

This Statement on Third Party Observers in Psychological Testing and Assessment is intended to be informational, rather than prescriptive. The inclusion of a third party in psychological evaluations raises complex and sometimes paradoxical issues. Inclusion of a third party in the assessment and testing process may affect validity of an evaluation or threaten test security and copyright. However, a third party may facilitate validity and fairness of the evaluation or be required by law. Options to address the request for external observation include, but are not limited to (1) conducting the evaluation in the presence of an observer, (2) minimizing the intrusion afforded by observation, (3) utilizing assessment measures that are less affected by observation, (4) recommending that the request for a third party be withdrawn, and (5) declining to perform the assessment under observation. Psychologists will need to exercise their own professional judgment in choosing the appropriate course of action. Regardless of reasons for such a request (e.g., forensic case, supervision of a trainee, etc.) and/or option(s) chosen, further empirical studies are needed to address the multifaceted situations that psychologists may face with third party participants. The overall goal of any situation surrounding the formal psychological evaluation of an individual is to maximize the assessment conditions to complete the most valid and fair evaluation in order to obtain the best data possible.

## REFERENCES

American Academy of Clinical Neuropsychology. (2001). Policy statement on the presence of third party observers in neuropsychological assessments. *The Clinical Neuropsychologist, 14,* 433-439.

American Educational Research Association, American Psychological Association, & National Council on Measurement in Education. (1999). *Standards for educational and psychological testing.* Washington, DC: American Educational Research Association.

American Psychological Association. (2002). Ethical principles of psychologists and code of conduct. *American Psychologist, 57,* 1060-1073.

Anastasi, A., & Urbina, S. (1997). *Psychological testing* (7th ed.). Upper Saddle River, NJ: Prentice-Hall.

Binder, L., & Johnson-Greene, D. (1995). Observer effects on neuropsychological performance: A case report. *The Clinical Neuropsychologist, 9,* 74-78.

Cato, M., Brewster, J., Ryan, T., & Giuliano, A. (2002). Coaching and the ability to simulate traumatic brain injury symptoms. *The Clinical Neuropsychologist, 16,* 5224-535.

Chekroun, P., & Brauer, M. (2002). The bystander effect and social control behavior: The effect of the presence of others on people's reactions to norm violations. *European Journal of Social Psychology, 32*(6), 853-866.

Committee on Legal Issues. (2006). Strategies for private practitioners coping with subpoenas or compelled testimony for client records or test data. *Professional Psychology: Research and Practice, 37,* 215-222.

Committee on Psychological Tests and Assessment. (1996a). Statement on the disclosure of test data. *American Psychologist, 51,* 644-648.

Committee on Psychological Tests and Assessment. (1996b). *Statement on the use of secure psychological tests in the education of graduate and undergraduate psychology students.* Retrieved September 4, 1999, from http://www.apa.org/science/securtst.html

Committee on Professional Practice and Standards. (1993). Record keeping guidelines. *American Psychologist, 48,* 984-986.

Constantinou, M., Ashendorf, L., & McCaffrey, R. J. (2006). Effects of third party observer during neuropsychological assessment: When the observer is a video camera. *Journal of Forensic Neuropsychology, 4*(2), 83-95.

Duff, K., & Fisher, J. M. (2005). Ethical dilemmas with third party observers. *Journal of Forensic Neuropsychology, 4*(2), 65-82.

Gavett, B. E., Lynch, J. K., & McCaffrey, R. J. (2006). Third party observers: The effect size is greater than you might think. *Journal of Forensic Neuropsychology, 4*(2), 49-64.

Gutheil, T. G. (2003). Reflections on coaching by attorneys. *Journal of the American Academy of Psychiatry & the Law, 31,* 6-9.

Isaacs, M., & Chen, K. (1990). Presence/absence of an observer in a word association test. *Journal of Personality Assessment, 55*(1), 41-51.

Kehrer, C., Sanchez, P., Habif, J., Rosenbaum, G., & Townes, B. (2000). Effects of a significant-other observer on neuropsychological test performance. *The Clinical Neuropsychologist, 14,* 67-71.

Lees-Haley, P. R. (1997). Attorneys influence expert evidence in forensic psychological and neuropsychological cases. *Assessment, 4,* 321-324.

Lynch, J. (2005). Effect of a third party observer on neuropsychological test performance following closed head injury. *Journal of Forensic Neuropsychology, 4*(2), 17-25.

Lynch, J., & McCaffrey, R. (2004). Neuropsychological assessments in the presence of third parties: Ethical issues and literature review. *NYS Psychologist, 16*(3), 25-29.

McCaffrey, R. J., Fisher, J. M., Gold, B. A., & Lynch, J. K. (1996). Presence of third parties during neuropsychological evaluations: Who is evaluating whom? *The Clinical Neuropsychologist, 10,* 435-449.

McSweeny, A. J., Becker, B. C., Naugle, R. I., Snow, W. G., Binder, L. M., & Thompson, L. (1998). Ethical issues related to the presence of third party observers in clinical neuropsychological evaluations. *The Clinical Neuropsychologist, 12,* 552-559.

Masling, J. M. (1960). The influence of situational and interpersonal variables in projective testing. *Psychological Bulletin, 57,* 65-85.

National Academy of Neuropsychology Policy and Planning Committee (2000a). Presence of third party observers during neuropsychological testing: Official statement of the National Academy of Neuropsychology. *Archives of Clinical Neuropsychology, 15,* 379-380.

National Academy of Neuropsychology Policy and Planning Committee (2000b). Test security: Official statement of the National Academy of Neuropsychology. *Archives of Clinical Neuropsychology, 15,* 383-386.

Podmore, D., Chaney, D., & Golder, P. (1975). Third parties in the interview situation: Evidence from Hong Kong. *Journal of Social Psychology, 95*(2), 227-231.

Rosen, G. M. (1995). The Aleutian Enterprise sinking and posttraumatic stress disorder: Misdiagnosis in clinical and forensic settings. *Professional Psychology: Research and Practice, 26,* 82-47.

Sattler, J. M. (1988). *Assessment of children* (3rd ed.). San Diego, CA: Jerome M. Sattler, Publisher.

Sattler, J. M. (2001). *Assessment of children: Cognitive applications* (4th ed.). San Diego, CA: Jerome M. Sattler, Publisher.

Sattler, J. M., & Hoge, R. D. (2006). *Assessment of children: Behavioral, social, and clinical foundations* (5th ed.). San Diego, CA: Jerome M. Sattler, Publisher.

Sattler, J. M., & Theye, F. (1967). Procedural, situational, and interpersonal variables in individual intelligence testing. *Psychological Bulletin, 68,* 347-360.

Van Krunkelsven, E., Dupain, J., Van Elsacker, L., & Verheyen, R. (1999). Habituation of bonobos (Pan paniscus): First reactions to the presence of observers and the evolution of response over time. *Folia Primatologica, 70*(6), 365-368.

Victor, T. L., & Abeles, N. (2004). Coaching clients to take psychological and neuropsychological tests: A clash of ethical obligations. *Professional Psychology: Research & Practice, 35,* 373-379.

Wechsler, D. (1997a). *WAIS-III: Administration and scoring manual.* San Antonio, TX: The Psychological Corporation.

Wechsler, D. (1997b). *WMS-III: Administration and scoring manual.* San Antonio, TX: The Psychological Corporation.

Yantz, C., & McCaffrey, R. (2005). Effects of a supervisor's observation on memory test performance of the examinee: Third party observer effect confirmed. *Journal of Forensic Neuropsychology, 4*(2), 27-38.

Youngjohn, J. R. (1995). Confirmed attorney coaching prior to neuropsychological evaluation. *Assessment, 2,* 279-283.

1998 WL 765126
Only the Westlaw citation is currently available.
United States District
Court, District of Columbia.

John CHIPERAS, Plantiff,
v.
Robert E. RUBIN, Secretary
of the Treasury, Defendant.

No. CIV.A.96–130TPJ/
JMF.   |   Nov. 3, 1998.

Opinion

FACCIOLA.

## MEMORANDUM OPINION

*1 This matter is before me to resolve three new discovery disputes. [1]

[1] It seems that these parties are always before me to resolve discovery disputes. *See. e.g.* *Chiperas v. Rubin.* Civ. A. No. 96–130. 1998 WL 531845 (D.D.C. Aug 24, 1998).

## THE RAW DATA PROBLEM

In this Title VII action, plaintiff intends to call Dr. Sherry D. Molock who conducted a psychological evaluation of him. She concluded that "[b]ased on the results of this psychological evaluation, your client [i.e. plaintiff] suffered from Major Depressive Disorder that resulted from the incidents that are described in this complaint." Letter of December 29, 1997, attached as exhibit to *Defendant's Motion to Compel the Production of Plaintiff's Experts Raw Data and Test Results, to Require Plaintiff to Undergo an Independent Medical psychological Examination Or, in the Alternative to Strike Plaintiff's Expert* (hereafter "D. Mot."). Plaintiff will, of course, rely on Dr. Molock's testimony in support of his contention that the discrimination he suffered caused him severe and permanent psychological damage.

The first problem has arisen because the defendant, having noticed Dr. Molock's deposition, served her

with a *subpoena duces tecum,* requiring her to produce "[c]opies of any and all raw data & test results of tests administered to Mr. John Chiperas, by you or at your direction, including any MMPI–2 Test, Draw–A–Person (DAP) Test, Rorschach, and The Weschler Adult Intelligence Scale-revised (WAIS–R)."

In response, plaintiff's counsel stated:

> Pursuant to Fed.R.Civ.P. 45(c) (2)(B), we object to producing the requested materials on the grounds that they are privileged. Specifically, Dr. Molock is not ethically permitted to deliver raw data or test protocols to you or someone in your office because you are not qualified to use the information.

Letter of August 24, 1998 attached to D. Mot.

Ethical principle number 8 of the psychology profession, published by the American Psychological Association, the national accrediting body of psychologists in the United States, provides:

> Psychologists make every effort to maintain the security of tests and other assessment techniques within the limits of legal mandates. They strive to ensure the appropriate use of assessment techniques by others.

*See Casebook on Ethical Principles of Psychologists,* American Psychological Association, at 109(1987).

It appears that compliance with this provision has long been viewed as prohibiting the disclosure of test materials, raw test data, or protocols to any person other than another qualified psychologist, who would then similarly be bound by this ethical principle to maintain the security of the data. Thus, the *Standards for Education and Psychological Testing,* also published by the American Psychological Association in 1985, state:

> Responsibility for test use
> should be assumed by
> or delegated only to
> those individuals who have
> the training and experience
> necessary to handle this
> responsibility in a professional
> and technically adequate
> manner.

Since Dr. Molock might be disciplined for violating this principle and this standard, plaintiff's counsel on her behalf has made the privilege claim quoted above.[2]

[2]   For an application of these standards in a particular context, see *Detroit Edison Co. v. National Labor Relations Board,* 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979).

**\*2** But, plaintiff, as a party to this action has no standing to quash a subpoena issued to someone who is not a party to the action unless the party claims some personal right or privilege with regard to the documents sought. *WestsideMarrero Jeep Eagle, Inc. v. Chrysler Corporation, Inc.,* Civ. A. No. 97–3012, 1998 WL 186705 (E.D.La. April 17, 1998); *Florida v. Jones Chemicals, Inc.,* Civ. A. No. 90–875, 1993 WL 388645 (M.D.Fla. March 4, 1993); 9 Wright & Miller, *Federal Practice and Procedure* § 2459 at 41 (1995). Plaintiff cannot claim any privilege as to the raw data; by offering the doctor as a witness he has waived any claim of doctor patient privilege. *First Interstate Bank of Oregon v. National Bank and Trust Company of Norwich,* 127 F.R.D. 186 (D.Ore.1989). Thus, he lacks standing to quash the subpoena.

Even if he had standing, events have overtaken his claim of privilege. The defendant has now retained a psychiatrist, Dr. Christiane Tellefsen, to testify as its expert and Dr. Tellefsen has indicated that she will work with Dr. Sheri Bellow who is a licensed psychologist. Since it has not been contended that Dr. Bellow is incompetent to evaluate the raw data that defendant seeks, Dr. Moldock has no cause for concern that her surrender of the data to Dr. Bellow would violate any ethical canon of her profession. There is therefore no need to resolve whether the privilege claimed should bar the production sought by the *subpoena duces tecum.*

## THE INDEPENDENT
## MEDICAL EXAMINATION

Defendant has testified in his deposition as to the emotional distress he has suffered because of the discrimination he claims to have suffered. As just noted, he will offer in support of that claim the expert opinion of a psychologist that the defendant suffers from a Major Depressive Disorder, which is a disorder recognized and explained by the Diagnostic and Statistical Manual for Mental Disorders, published by the American Psychiatric Association (i.e. DSM–IV (4th ed.)).[3] Nevertheless, plaintiff, who will premise his claim for damages on that diagnosis and his expert's testimony, resists being subjected to an examination by defendant's expert psychiatrist and the administration of diagnostic, psychological tests. Plaintiff is thus in the identical position of a plaintiff who claimed, let us say, an orthopedic injury but resisted examination by the defendant's expert orthopedist. He tries to find support for his position by claiming that there are cases in which courts have insisted that good cause for an examination sought under Fed. R. Civ. 35(a) exists only when a plaintiff in a Title VII or similar case asserts a common law claim of the intentional infliction of emotional distress and he has asserted no such claim. But, the cases cited by plaintiff do not support that assertion. In *Bridges v. Eastman Kodak Co.,* 850 F.Supp. 216, 221 (S.D.N.Y.1994), the court, indicating the absence of any hard and fast rule, held that since plaintiff neither asserted an independent tort claim for emotional distress *nor* "an allegation of ongoing severe mental injury," it would not order an independent medical examination. The court went on to immediately note however, that, if the plaintiff asserted the existence of an ongoing mental illness (as is certainly the situation here), a request for a Rule 35(a) independent psychiatric examination might well be appropriate.

[3]   The illness is a serious one; DSM–IV reports that 15% of individuals affected by it take their own lives. DSM–IV at 340.

**\*3** In *O'Quinn v. New York University Medical Center*, 163 F.R.D. 226, 228 (S.D.N.Y.1995), the court also noted the absence of an independent tort claim for emotional distress *or* an allegation of severe emotional distress. Additionally, plaintiff's counsel had represented that plaintiff would not be seeking compensation for ongoing mental harm at trial. Thus, "because plaintiff herein will not pursue claims for ongoing severe emotional harm, defendant has not made an adequate showing that a Rule 35 examination is justified and the motion must be denied." The precise opposite is true; plaintiff will claim damages due to "severe emotional harm" and call an expert in support of that claim.

Finally, in *Lahr v. Fulbright & Jaworksi*, 164 F.R.D. 196 (N.D.Tex.1995), the plaintiff did press an independent tort claim of intentional infliction of emotional distress and there is therefore nothing in the opinion indicating what the Court would have done had it not been asserted. Moreover, and what is telling, the court found plaintiff's intention to call an expert witness in support of her claim to provide additional support for its determination that an independent examination was appropriate.

As that court indicated, such an intention militates strongly in favor of ordering such an examination. Plaintiff's expert will premise her opinion on (*inter alia*) her examination of the plaintiff and the psychological tests that she administered. It is simply impossible for the defendant to counter that opinion without an equal opportunity to examine the defendant and to administer tests to him. Since a competent diagnosis cannot possibly occur without an evaluation of the plaintiff's mental health, his symptoms, and complaints and that evaluation is impossible without interviewing plaintiff and testing him, the requirement of Fed. R. Civ. 35(a) that good cause for ordering such an examination is easily met. The federal courts have invariably ordered such an examination when a plaintiff predicates her damage claim in whole or in part on specific psychic harm done by the defendant's actions and tenders or anticipates that she will call an expert witness in support of that claim. *E.g Hirschheimer v. Associated Minerals & Minerals Corp.*, Civ. A. No. 94–6155, 1995 WL 736901 (S.D.N.Y.1995)("[S]ince the plaintiff plans to present testimony from his own psychological

expert [the defendant] must be given an opportunity to rebut any such evidence."); *Turner v. Imperial Stores*, 161 F.R.D. 89, 94 (S.D.Calif.1995)(stating that courts will order mental examinations when plaintiff alleges specific mental or psychiatric injury or disorder and offers expert testimony to support a claim of emotional distress); *Duncan v. Upjohn Co.*, 155 F.R.D. 23, 25 (D.Conn.1994)("The plaintiff intends to prove his claim at trial through the testimony of his own expert witnesses, which also constitutes good cause for permitting the defendant to conduct its own psychiatric examination of the plaintiff"); *Shepherd v. American Broadcasting Co.*, 151 F.R.D. 194, 212–213 (D.D.C.1993), *reversed and remanded on other grounds*, 62 F.3d 1469 (D.C.Cir.1995); *Lowe v. Philadelphia Newspapers Inc.*, 101 F.R.D. 296, 297–298 (E.D.Pa.1983).

**\*4** That these cases have reached this result is hardly surprising. If one purpose of discovery is to create equally informed parties and, in that sense, a level playing field, one is hard pressed to understand why a court would not permit an independent mental examination when the party to be examined contemplates use of an expert to substantiate her claim that she has endured psychological harm at the hands of the other party. That this result would obtain goes without saying if the plaintiff claimed a physical injury. Plaintiff suggests no reason why the result should be different merely because he claims harm to his psyche rather than, let us say, his lower back.

Plaintiff also insists, that if the independent mental examination is to be ordered, that the Court order that (1) it be limited to a certain number of hours; (2) that the expert plaintiff intends to call be permitted to attend it; (3) that it be tape recorded and (4) the tests his expert administered not be administered again. Dr. Tellefsen has indicated, however, that:

> I understand that there has been a request to have Chiperas' therapist or attorney present at the interview. I am opposed to this. The presence of other persons in a psychiatric interview is intrusive and interferes with my ability to perform a standard psychiatric evaluation. The presence of

> another person emphasizes the adversarial nature of the situation, which may lead to the interviewee to alter their responses, thus interfering with my ability to get a true assessment of the individual. My standard practice is not to allow this in my evaluations.

Letter of October 5, 1998 from Christiane Tellesfsen, M.D., to Clair Whitaker, Esq., attached to *Defendant's Memorandum in Reply to Plaintiff's Opposition to Motion to Compel Production of Raw Data and Test Results from Plaintiff's Expert, to Order an Independent Medical Examination, or in the Alterative, to Strike Plaintiff's Expert.*

Plaintiff does not tender any countering information nor provide any reason why Dr. Tellesfen's objection should not be honored. Certainly, I utterly lack the expertise to reach a different conclusion and I will not condition the examination upon the presence of any one else during it. *See Duncan v. Upjohn Co.,* 155 F.R.D. 23, 26 (D.Conn.1994)(rejecting request for presence of plaintiff's psychiatric expert at mental examination by defendant's expert). *Contra: Lowe v. Philadelphia Newspapers, Inc.,* 101 F.R.D. 296, 298 (E.D.Pa.1983).

As to the administration of other tests, as I read Dr. Tellesfen's letter, she contemplates administering to plaintiff tests that are in addition to ones already administered. Even if this were not so, I would be loath to interfere with a conscientious determination by a medical professional that a test should be repeated to reach a sound scientific conclusion.

I understand the parties to be ready to agree as to length of the examination, and the place, date and time for it. If necessary, I will order that, unless otherwise necessary, the examination should take no more than 6 hours.

**\*5** Finally, the courts have consistently rejected the demand that independent mental examinations be tape recorded or that a court stenographer be present. *Hirschheimer,* 1995 WL 736901 at \*3; *Tirado v. Erosa,* 158 F.R.D. 294, 296–298 (S.D.N.Y.1994); *Tomlin v. Holecek,* 150 F.R.D. 628,

631–632 (D.Minn.1993). As they have concluded, the presence of a stranger will necessarily inhibit the candor and frankness of the examinee's discussion of what may be intimate and embarrassing matters, such as sexual dysfunctions, dreams, or previously unarticulated desires and emotions. Weighed against that interest is the need for an accurate transcription of what occurred. But, plaintiff will be present at the examination and can report to his counsel exactly what occurred. The expert can be expected to provide a written report which will summarize the interview and describe the tests administered. There are therefore other mechanisms available to recreate what occurred. In the absence of some reason to believe that competent medical professionals can be expected to misrepresent what occurred during a psychiatric evaluation, the need for a technically perfect record yields to the potential harm to be done if the presence of a stenographer or tape records inhibits the interviewee's discussion of what have to be matters he might well prefer to keep to himself. I will therefore not order that the examination be tape recorded.

## PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S EXPERT DESIGNATION

It is not Judge Jackson's practice to issue, as part of his scheduling order, a formal schedule for the designation and counter designation of expert witnesses. Instead, his order provides that depositions of adverse expert witnesses are to be permitted even though a party has filed a Fed.R.Civ.P. 26(b)(4) statement.

I issued an order from the bench, on January 15, 1998, that the parties agree upon a joint discovery plan for remaining discovery. Discovery was then scheduled to close on January 31, 1998. On the day before that deadline, the parties filed a joint discovery plan with Judge Jackson and a joint motion to extend the discovery deadline to February 27, 1998. In that motion they reported that plaintiff had designated an expert witness to testify to the issue of emotional distress and that plaintiff had sent a copy of this expert's report to defendant's counsel on December 30, 1997. Defendant was said to be intending to file a motion to strike the witness. If that motion was denied, this expert was to be deposed on February 16, 1998. Counsel expressed their understanding that the

defendant was to designate a countering expert witness and that plaintiff would need an opportunity to take his deposition. They did not, however, agree on deadlines for the defendant to designate his expert and the date for that expert's deposition.

In the meanwhile, the defendant had moved that discovery be extended from January 31, 1998 to February 10, 1998. Defendant believed that plaintiff's expert would be made available on January 30, 1998, and that defendant's counsel, who was in the process of retaining a countering expert, would need five working days to have her expert submit a report.

*6 Judge Jackson did not rule on that motion nor did he refer it to me. Instead, on February 4, 1998, he held a status conference and ultimately extended discovery until November 30, 1998. Again, he set no specific deadlines for the designation of an expert witness by the defendant or the deposition of that witness.

Defendant's counsel, believing that Judge Jackson had extended the discovery deadline for all purposes, then began to make efforts to depose plaintiff's expert witness. Those efforts proved fruitless because of plaintiff's assertion that the raw data generated or used by plaintiff's expert would not be made available to defendant's counsel before or at the deposition. On September 9, 1998, defendant notified plaintiff's counsel of the name of her countering expert witness and on September 10, 1998, defendant moved to compel the production of the raw data.

Plaintiff has now cross moved that defendant's expert witness designation be stricken, in effect, precluding the defendant from calling her. Plaintiff argues that since Judge Jackson never ruled on defendant's motion to extend the discovery deadline the deadlines of Fed.R.Civ.P. 26(a)(2)(C) applied so that defendant had only 30 days from December 30, 1997 within which to designate his countering expert. Since defendant was never relieved by court order from that obligation, defendant was in default of that obligation when nine months later defendant named his countering expert on September 9, 1998. It therefore follows, according to plaintiff, that defendant should be precluded from calling that witness.

But, Judge Jackson understandably did not rule on the defendant's motion to extend the discovery deadline to February 10, 1998; he was, after all, extending the deadline for all discovery until November 30, 1998 and there would be no reason for him to segregate one aspect of discovery for specialized treatment. It was equally understandable for defendant's counsel to view the extension of the discovery deadline as relieving her of the obligation to designate her expert by February 10, 1998. Additionally, since Judge Jackson's scheduling order advises counsel that a formal schedule for the designation and cross-designation of expert witnesses will ordinarily not be issued and that depositions of experts will be permitted, whether or not 26(b)(4) disclosures are made or exchanged, counsel justifiably read that order as an indication that Judge Jackson expected counsel to agree to dates for expert depositions as they would for all other discovery matters. It is, on the other hand, illogical to say that defendant was in default of the obligation to designate his expert by February 4, 1998 when the second scheduling order obliterated all previous discovery obligations by setting new dates for the conclusion of discovery.

Additionally, plaintiff's claim of prejudice rings hollow. Plaintiff will have adequate time before discovery closes to depose defendant's expert once that expert has completed her evaluation of the plaintiff.

*7 Finally, as to precluding the witness's testimony, I have stated on a previous occasion:

> In considering whether a discovery sanction as significant as precluding a witness's testimony is appropriate, the court is obliged to consider the effect of the conduct for which that sanction is sought has had on the court's docket, whether it has prejudiced that party's opponent, and whether deterrence is necessary to protect the integrity of the judicial system. *Bristol Petroleum Corp. v. Harris,* 901 F.2d 165, 167 (D.C.Cir.1990). As to the last issue, however, "sanctions based only on principles of deterrence 'call for careful evaluation to ensure that the proper individuals are being sanctioned (or deterred) and that the sanctions or deterrent measures are not overly harsh.' " *Bonds v. District of Columbia,* 93 F.3d 801, 807–808 (D.C.Cir.1996), quoting *Shea v. Dinah Construction Co.,* 795 F.2d 1071, 1077 (D.C.Cir.1986). Accordingly, "a

discovery sanction imposed for its deterrent effect must be calibrated to the gravity of the misconduct." *Bonds,* 93 F.3d at 808. The central consideration in imposing any discovery sanction is the proportion between the offense and the sanction. To be just, therefore, the sanction must never be any more severe than it need be to correct the harm done and to cure the prejudice created to the other party, unless the opposing party's behavior has been so flagrant or egregious that deterring similar conduct in the future in itself warrants the sanction sought:

> *2 Thus, the district court was obliged to consider whether the more severe sanction was necessary to further interests other than deterrence, or, if not, whether a less severe sanction would have been more proportionate to the nature of the District's discovery violation and its effects on the litigation.

*Bonds,* 93 F.3d at 808.

*Walker v. District of Columbia,* Civ. A. No. 96–1267, 1998 WL 429834, *1 (D.D.C. June 12, 1998).

Using that stringent standard, the remedy of precluding defendant from calling the expert witness would be a clear abuse of discretion. As I have indicated, despite his protestation to the contrary, plaintiff has not been prejudiced by the defendant's designation of his expert witness in September since there is sufficient time to have her complete her examination of plaintiff and have her deposition taken before discovery ends on November 30, 1998. Furthermore, I certainly cannot characterize defendant's behavior as a flagrant or egregious violation of a discovery rule or any order issued by either me or Judge Jackson. To the contrary, it was justifiable for defendant's counsel to interpret these events as relieving her of the obligation to name defendant's expert by February 10, 1998. There is therefore no warrant whatsoever for the remedy plaintiff seeks.

*8 An order accompanies this memorandum

---

© 2014 Thomson Reuters. No claim to original U.S. Government Works.