# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
CANDICE MILES,                       )
)
       Plaintiff,            )
)
     v.                  )      Civil Action No. 12-378 (RBW)
)
HOWARD UNIVERSITY,[1]     )
)
      Defendant.       )
_____)

## MEMORANDUM OPINION

The plaintiff, Candice Miles, filed this civil action against defendant Howard University

("Howard"), alleging violations of the federal Family and Medical Leave Act ("FMLA"), 29

U.S.C. §§ 2611-19 (2012), the District of Columbia Family and Medical Leave Act

("DCFMLA"), D.C. Code §§ 32-501 to -517 (2001), Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. §§ 2000e to e-17 (2012), and the District of Columbia Human Rights

Act ("DCHRA"), D.C. Code §§ 2-1401.01 to -1431.08 (2001).  Amended Complaint ("Compl.")

¶¶ 116-59.  Currently before the Court is Howard's motion for summary judgment.  Defendant

Howard University's Motion for Summary Judgment ("Def.'s Summ. J. Mot.").  For the reasons

explained below, the Court must grant Howard's motion.[2]

---

[1]  The plaintiff initially named the University of the District of Columbia as a defendant in this case, but has since dismissed all claims against that former defendant.  July 16, 2014 Minute Order.

[2]  In deciding Howard's summary judgment motion, the Court considered the following filings made by the parties in addition to those already identified: (1) Defendant Howard University's Memorandum of Law in Support of Its Motion for Summary Judgment ("Def.'s Summ. J. Mem."); (2) Defendant Howard University's Statement of Material Undisputed Facts in Support of Motion for Summary Judgment ("Def.'s Summ. J. Facts"); (3) Plaintiff Candice Miles' Opposition to Defendant Howard University's Motion for Summary Judgment ("Pl.'s Opp'n"); (4) Plaintiff Candice Miles' Statement of Material Facts in Dispute in Support of Motion for Summary Judgment ("Pl.'s Summ. J. Facts"); (5) Defendant Howard University's Reply Memorandum in Further Support of its Motion for Summary Judgment ("Def.'s Reply"); and (6) Defendant Howard University's Reply to Plaintiff Candice Miles' Statement of Material Facts in Dispute ("Def.'s Reply Facts").

# I.   BACKGROUND

## A.  The District Of Columbia Small Business Network And The Plaintiff's Employment

"During all . . . periods [of time relevant to this case]," the United States Small Business Administration ("Small Business Administration") has annually "awarded Howard a grant to run . . . [the District of Columbia] Small Business Development Center" Network ("Small Business Network"). Pl.'s Summ. J. Facts ¶ 1. Under that grant, Howard manages the "Lead Center" and "award[s] annual subcontracts to individual non-profit organizations" throughout the District of Columbia that are required to host "Service Centers," which "provide small-business development services" to third parties. Id. ¶ 2. These Service Centers comprise the Small Business Network. See id. ¶ 14. One of these non-profit organizations was the University of the District of Columbia School of Business ("UDC"). Id.

"In late 2008," the Dean of UDC, Charlie Mahone, formed a "Search Committee" to hire "a new Director of the UDC Service Center." Id. ¶¶ 20-21. Although Dean Mahone was "not required" to do so, he "invited" Henry Turner, the Executive Director of the Howard Lead Center at the time, "to serve on the Search Committee." Id. ¶¶ 4, 21. One candidate who "applied for the position of Service Center Director at UDC" was the plaintiff. Id. ¶ 20. Despite Mr. Turner's "reservations about hiring" the plaintiff for the position, she was "nonetheless hired after Dean Mahone agreed that he would mentor [the plaintiff] in the position." Id. ¶ 22 (internal quotation marks omitted).

The plaintiff began serving as the Director of the UDC Service Center in January 2009. Id. ¶ 24. The plaintiff's "office was located at UDC," and she worked there "almost every day." Id. ¶ 29. She "generally did not visit Howard's Lead Center more than a couple of days a

month." Id. ¶ 29.  Dean Mahone was the plaintiff's "direct supervisor" at the UDC Service

Center. Id. ¶ 30.  The plaintiff was able to "create[] her own schedule to best address the goals

of the UDC Service Center." Id. ¶ 39 (internal alteration omitted).  She "was responsible for

preparing [the] UDC [Service Center]'s strategy to achieve the contractual goals specified in the

Howard[-]UDC subcontract, as well as work plans for the UDC Service Center." Id. ¶ 42.  The

plaintiff "had to use her own professional judgment when counseling clients[] and in selecting

topics for training workshops." Id. ¶ 41.  Further, "UDC carried [the plaintiff] on its payroll,

issued her paychecks, and provided her with health and disability insurance." Id. ¶ 29.  The

plaintiff was also "subject to UDC's leave policies." Id.  And UDC "had [the plaintiff's]

personnel files." Id.

       After January 2010, the individual Service Centers in the Small Business Network

"worked more independently" from Howard's Lead Center and there was "decreased

cooperation" with Howard's Lead Center. Id. ¶ 47.  Mr. Turner's supervisor, Barron Harvey, the

Dean of the Howard School of Business, "became dissatisfied with [Mr.] Turner's leadership"

and "critic[al] [of Mr.] Turner's performance" as the Executive Director of the Howard Lead

Center. Id. ¶ 6.  Throughout Mr. Turner's tenure, the plaintiff received "little communication as

to the vision and direction of the [Small Business] [N]etwork and the individual [S]ervice

[C]enters" from the Howard Lead Center.[3] Id. ¶ 45.  Mr. Turner "eventually decided to retire

effective July . . . 2010." Id. ¶ 7.

---

[3] The UDC Service Center had also been without a "business counselor" since "June 2010," as the incumbent had
left "after disputes with [the plaintiff] and after complaining about her condescending attitude." Pl.'s Summ. J.
Facts ¶ 79 (internal quotation marks omitted); see also id. ¶ 78.

In that same month, Howard hired Don Wilson "as a consultant to lead the search for a new Executive Director of the Howard Lead Center[] and to provide advice about the [Small Business] [N]etwork." Id. ¶ 10.  In December 2010, an "accreditation team" from the Association of Small Business Development Centers ("Association") "visited the District of Columbia and . . . several [S]ervice [C]enters, including UDC." Id. ¶ 61.  The Association "ran the Congressionally-approved accreditation program for" small business "networks across the [United States]." Id. ¶ 11.  The Association accreditation team "met with Howard's Dean Harvey" and "told him that substantial improvement in the [Small Business] [N]etwork was required[] and that the performance of the UDC Service Center was especially problematic." Id. ¶ 62 (internal quotation marks omitted).  Based on these remarks, "Howard feared that . . . the [Small Business Administration] . . . [would] cancel the grant for the entire [Small Business] [N]etwork."[4] Id. ¶ 63.

Early the following year, in February 2011, "Darrell Brown started work as the new Executive Director of the Howard Lead Center." Id. ¶ 12.  At that time, both Mr. Brown and Mr. Wilson "concluded that UDC . . . was the worst-performing [Service] Center in the [Small Business] [N]etwork." Id. ¶ 58 (internal quotation marks omitted); see also id. ¶ 72.  During that month, Howard also "received a draft of the [Association] accreditation team's report" regarding the Small Business Network, which "recommended deferral of accreditation." Id. ¶ 68 (internal quotation marks omitted); see also id. ¶ 63.  The report "called upon the [Small Business] [N]etwork to revisit and analyze its organizational structure for service delivery," which Mr. Brown interpreted as "calling for a restructuring analysis of who [Howard] partnered with." Id. ¶

---

[4]  The Howard Lead Center "decided to renew the [Howard-UDC] subcontract for 2011 so that [the] UDC[] [Service Center's] status could be reviewed once a new Executive Director was hired for the [Howard] Lead Center." Pl.'s Summ. J. Facts ¶ 66.

68 (internal quotation marks omitted).  In that same month, "Howard also received word that the [Small Business Administration] was planning to terminate the grant for the entire [Small Business] [N]etwork," as the Small Business Administration was not going to "allow the status quo to continue[]" and warned  Howard "that termination of the [Small Business Administration] grant was a distinct possibility."  Id. ¶ 71.

In March 2011, Mr. Brown and Mr. Wilson "had dinner with several members of the [Association] accreditation team."  Id. ¶ 69.  The members "commented that it was necessary for Howard to seriously restructure the [Small Business] Network and to do so quickly" and informed Mr. Brown that "Howard may have to change sub-hosts (i.e., change its [S]ervice-[C]enter subcontractors)," including "tak[ing] a hard look at UDC."  Id. (internal quotation marks omitted).  Subsequently, the Association accreditation team's final report informed Howard that the Small Business Network was "currently unaccredited" and that it "had one year to cure the problems identified by the [Association]."  Id. ¶ 88.  Based on this deferral of accreditation, the Small Business Administration reiterated that it "could terminate the . . . grant with Howard."  Id. ¶ 89 (internal quotation marks omitted).  Thus, "[t]he entire grant was in serious jeopardy."  Id. (internal quotation marks omitted); see also id. ¶ 90 ("[The Small Business Administration] called for tough decisions by Howard, including the immediate need to put action plans in place to address concerns about the quality and strength of partnerships needed for an effective [Small Business Network].  UDC was the worst[-]performing such partnership." (internal ellipses and quotation marks omitted)).  But the Small Business Administration decided to afford Howard some time to "reset the foundation" of the Small Business Network and bring it "into compliance" with the requirements of the grant.  Id.  "At all

times, [the plaintiff] recognized that [the] UDC [Service Center] needed to improve its

performance." Id. ¶ 65.

### B.  The Plaintiff's Pregnancy And Termination

The plaintiff "learned that she was pregnant in August 2010, with an expected due date of

April 3, 2011." Id. ¶ 50.  She informed Dean Mahone that she was pregnant in the fall of 2010.

Id. ¶ 51.  However, "[s]he did not tell anyone at the Howard Lead Center about her pregnancy

[or the expected date of her child's birth] until January 2011."[5]  Id. ¶ 50.  In February 2011, the

plaintiff requested leave from UDC beginning on April 3, 2011, which coincided with her

expected due date.  See, e.g., Pl.'s Opp'n, Exhibit ("Ex.") 21 (Declaration of Candice Miles

("Miles Decl.")) ¶ 67.  Because of "unexpected complications," however, on March 7, 2011, the

plaintiff was placed "on [temporary] bed rest" by her doctor, and then on March 11, 2011, her

doctor required her to remain on bed rest for the remainder of her pregnancy.[6]  Pl.'s Summ. J.

Facts ¶ 52; Pl.'s Opp'n, Ex. 21 (Miles Decl.) ¶¶ 75, 77.

A week later, on March 14, 2011, the plaintiff "advised . . . [Mr.] Brown [in an email]

that she had started [her] FMLA leave" and "that her planned return date would fall between

June 27 and July 25[, 2011]."[7]  Pl.'s Summ. J. Facts at 27 ¶ 84, 28 ¶ 87.  When Mr. Brown

learned of the plaintiff's leave on March 14, 2011, he sent the plaintiff "an email wishing her

well" and inquiring about what "accommodations" the plaintiff  had "made to continue servicing

---

[5]  This was before Mr. Brown became the new Executive Director of Howard's Lead Center.  See Pl.'s Summ. J. Facts ¶ 12.

[6]  The plaintiff gave birth to her child on March 24, 2011.  Pl.'s Summ. J. Facts ¶ 52.

[7]  UDC approved the plaintiff's leave from the Service Center on March 25, 2011, for the period from April 3, 2011 through June 24, 2011.  See Pl.'s Opp'n, Ex. 19 (March 25, 2011 Human Resources Letter ("Human Resources Letter")).

. . . clients while . . . [she was away] on leave," id. ¶ 92, as she "had an obligation to make
arrangements for the servicing of [the] UDC [Service Center]'s clients while she . . . [was] out on
expected maternity leave," id. ¶ 97.  But prior to the March 14, 2011 email sent to Mr. Brown,
the plaintiff "had not . . . informed the Howard Lead Center of any plan for servicing [the] UDC
[Service Center]'s clients during the period in which [the plaintiff was] expected to be on leave,"
id. ¶ 93, except to refer clients to another Service Center, see id. ¶¶ 100, 101.  Mr. Brown
became "concerned when he learned on March 14, 2011, that counseling services were not being
provided at [the] UDC [Service Center]."  Id. ¶ 105.  Mr. Brown "believed that [the] UDC
[Service Center] had an obligation to ensure that the Service Center [was] operational and
functioning."  Id. (internal quotation marks omitted).  "Mass referrals by [the] UDC [Service
Center] of its clients were considered by [Mr.] Brown to be the last option used, not the first, and
not one that should have persisted for more than a few weeks."  Id. (internal quotation marks
omitted).

   A meeting between Howard representatives and UDC's Dean Mahone was subsequently
convened on April 1, 2011, "to discuss the UDC Service Center."  Id. ¶ 109.  During this
meeting, "[Mr.] Brown told Dean Mahone that [because] the UDC Service Center was
underperforming, its Director was on leave, and it had no business consultant, [the] UDC
[Service Center] would be asked to put together a contingency plan to ensure that the [UDC
Service] Center would [continue to] function."  Id. ¶ 110 (internal quotation marks omitted).
Dean Mahone was also informed "that the [Small Business Administration] was demanding
significant corrective actions for the [Small Business] [N]etwork and major structural changes."
Id.

Mr. Brown then "followed up the April 1, 2011 meeting by sending [the] UDC [Service Center] a letter dated April 7, 2011." Id. ¶ 120.  The letter notified the Service Center that Howard was placing it on "probation" and warned the Service Center that the Howard-UDC subcontract (or "subcontract") "could be terminated if it did not submit a satisfactory 'Recovery Plan' within 30 days." Id. ¶ 121 (certain internal quotation marks omitted).  The letter also "identified several serious deficiencies in [the] UDC [Service Center]'s performance." Id. ¶ 122 (citing Def.'s Summ. J. Mem., Ex. 25 (April 7, 2011 Letter from Mr. Brown to Dean Mahoney ("Apr. 7, 2011 Letter")) at 1).  According to the letter, one such deficiency was that

> the [UDC] Service Center Director [wa]s . . . on maternity leave.  She took leave without prior notification to the Executive Director [of the Howard Lead Center]. She notified the Executive Director she was taking leave only after her leave started and she failed to make any meaningful provision for the continuation of client services at the UDC [S]ervice [C]enter.  Moreover, the [UDC Service] Center Director failed to communicate to the Executive Director a specific date and time for returning to work.  The [UDC Service] Center Director essentially abandoned the [S]ervice [C]enter and its clients by her failure to take the necessary and proper steps to assure viable operation of the [S]ervice [C]enter. Further, the Center Director failed to communicate to the Executive Director that the [S]ervice [C]enter would cease to function when she took maternity leave. Today, the [S]ervice [C]enter is not functioning except for making referrals to other service centers.

Def.'s Summ. J. Mem., Ex. 25 (Apr.7, 2011 Letter) at 2; see also Def.'s Summ J. Mem., Ex. 8 (Candice Miles Deposition Transcript ("Miles Dep. Tr.") at 195:4-197:10).  In light of the aforementioned deficiencies, the letter recommended that the UDC Service Center "consider" as part of its Recovery Plan

> replacing the [UDC] Service Center Director with a more experienced person, who has an educational background and meaningful experience in marketing, business development, consulting, and communications.  Should [UDC] decide to replace the [UDC] Service Center Director, the final selection of a new Service Center Director shall be subject to the [Howard] Lead Center's approval.

Def.'s Summ. J. Mem., Ex. 25 (Apr. 7, 2011 Letter) at 2.

On May 6, 2011, Dean Mahoney responded to Mr. Brown's April 7, 2011 letter, "acknowledg[ing] that the UDC [Service] Center ha[d] not met many of its goals" and that the Service Center was "prepared to take the necessary corrective action." Def.'s Summ. J. Mem., Ex. 26 (May 6, 2011 Letter from Dean Mahoney to Mr. Brown ("May 6, 2011 Letter")) at 1); id. at 1-3 (identifying corrective actions that the UDC Service Center would institute).

After reviewing Dean Mahoney's May 6, 2011 letter, Mr. Brown replied on May 11, 2011, concluding that Dean Mahoney had not provided an adequate Recovery Plan, Summ. J. Mem. Ex. 23 (May 11, 2011 Letter from Mr. Brown to Dean Mahoney ("May 11, 2011 Letter")) at 1, and "add[ing] that [the] UDC Service Center could only avoid termination [of the Howard-UDC subcontract] if it agreed to several non-negotiable conditions, including the replacement of the UDC Service Center Director," Pl.'s Summ. J. Facts ¶ 133. Mr. Brown "explained that he wanted new leadership that had the ability to turn the [UDC Service] Center around and . . . [improve its performance], as the UDC Service Center was the worst-performing [Service] Center in the [Small Business] Network under the [plaintiff]'s leadership." Id. ¶ 133.

Later that month, on May 24, 2011, Howard formally terminated the Howard-UDC subcontract effective June 10, 2011, because the UDC Service Center failed to adopt Mr. Brown's suggested changes at the UDC Service Center, id. ¶ 136 (citing Def.'s Summ. J. Mem., Ex. 27 (May 24, 2011 Letter from Mr. Brown to Dean Mahoney ("May 24, 2011 Letter")) at 1), and the plaintiff "was terminated effective June 30, 2011," Pl.'s Opp'n, Ex. 21 (Miles Decl.) ¶ 107. After Howard's termination of the subcontract, the Small Business Administration "concluded during a . . . review of the [Small Business] [N]etwork that Howard's termination of the . . . subcontract was managerially and strategically sound." Id. ¶ 139. The Small Business Network "later regained full [Association] accreditation." Id.

As a result of the preceding events, the plaintiff filed this action against Howard alleging violations of the FMLA, the DCFMLA, and the DCHRA.  <u>Miles v. Univ. of the District of Columbia</u>, No. 12-cv-378(RBW), 2013 WL 5817657, at *5 (D.D.C. Oct. 30, 2013).  Howard moved to dismiss the case, arguing that the plaintiff failed to state claims upon which relief may be granted.  <u>Id.</u>  The motion was denied by the Court.[8]  <u>Id.</u> at *15.  As noted above, the case is now before the Court on Howard's motion for summary judgment.

## II.   STANDARD OF REVIEW

A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," based upon the depositions, affidavits, and other factual materials in the record.  Fed. R. Civ. P. 56(a), (c).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  And "a dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  <u>Arrington v. United States</u>, 473 F.3d 329, 333 (D.C. Cir. 2006) (quoting <u>Anderson</u>, 477 U.S. at 247).  The moving party bears the initial burden of showing the absence of a disputed material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  If this burden is satisfied by the moving party, the burden then shifts to the opposing party to "set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson</u>, 477 U.S. at 248.  "Although summary judgment is not the occasion for the court to weigh credibility or evidence, summary judgment is appropriate 'if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

---

[8]  The plaintiff also moved for leave to amend her complaint to add a Title VII claim for discrimination.  <u>Miles</u>, 2013 WL 5817657, at *14.  Howard opposed the motion, contending that it would be futile to allow the plaintiff leave to amend her complaint.  <u>Id.</u>  The Court granted the plaintiff's motion.  <u>Id.</u>

party will bear the burden of proof at trial.'" Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011) (citations omitted) (quoting Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [reasonable] jury to return a verdict for that party." Anderson, 477 U.S. at 249.  In making this assessment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party." Talavera, 638 F.3d at 308 (citing Anderson, 477 U.S. at 255).  These inferences, however, must be "justifiable." Anderson, 477 U.S. at 255.

## III.   ANALYSIS

### A.  Whether Howard Was A Joint Employer Of The Plaintiff

Howard disclaims liability for any alleged violations under the FMLA, the DCFMLA, the DCHRA, or Title VII on the ground that it was not an "employer" of the plaintiff under any of these statutes.  Def.'s Summ. J. Mem. at 27.  The plaintiff responds that Howard and UDC are liable for any violations under these statutes because they were "joint employers" of the plaintiff. Pl.'s Opp'n at 13-19.  The Court previously held that the joint employment inquiry under the relevant statutes at issue in this case was to be scrutinized under the tests espoused in Spirides v. Reinhardt, 613 F.2d 826, 831-32 (D.C. Cir. 1979), and NLRB v. Browning-Ferris Indus. of Pennsylvania, Inc., 691 F.2d 1117, 1123 (3d Cir. 1982)).  Miles, 2013 WL 5817657, at *7-8.[9] The Court now applies each test in turn.

---

[9]  When considering Howard's motion to dismiss earlier in this matter, the Court decided both tests were applicable out of an abundance of caution, as the District of Columbia Circuit has never explicitly rejected one test over the other.  Nevertheless, the Court notes that the Circuit is more inclined to adopt the Browning-Ferris test when the issue of joint employment arises in the context of the alleged statutory violations here.  See Redd, 232 F.3d at 940 (commenting that the Spirides test is likely "ill-suited to an analysis of whether an employee of a independent contractor is also an employee of the contractor's client"); see also Donuts Mid-Atl. Distribution Ctr., Inc. v. NLRB,

(continued . . .)

1. **The <u>Spirides</u> Test**

Since issuing the <u>Spirides</u> opinion, the District of Columbia Circuit has refined and simplified the method by which courts in this Circuit must evaluate the relationship between a putative employer and employee.  <u>Redd v. Summers</u>, 232 F.3d 933, 938 (D.C. Cir. 2000).  In <u>Redd</u>, the Circuit explained that the main consideration for the Court is the extent to which the putative employer has the "right to control the means and manner of the worker's performance." <u>Id.</u> (internal quotation marks omitted); <u>see also</u> <u>Spirides</u>, 613 F.2d at 831 (instructing courts to "analy[ze] the 'economic realities' of the work relationship").  "[I]f the putative employer has 'the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist.'" <u>Id.</u> (quoting <u>Spirides</u>, 613 F.2d at 831-32).  After analyzing the question of control, courts must also weigh: "the intent of the parties, primarily as reflected in the contract between the 'contractor' and its 'client'"; "whether contracting out work is justifiable as a prudent business decision"; "whether the business is exercising a degree of control that seems excessive in comparison to a reasonable client-contractor relationship in the same circumstances"; and "whether the relationship shares attributes commonly found in arrangements with independent contractors or with employees."  <u>Id.</u> at 939-40.

Viewing the facts in a light most favorable to the plaintiff and drawing all reasonable inferences in her favor, the Court concludes as a matter of law that Howard was not a joint

---

(. . . continued)
363 F.3d 437, 440 (D.C. Cir. 2004) (applying <u>Browning-Ferris</u> standard in conducting joint employment analysis); <u>Palmer v. Napolitano</u>, 867 F. Supp. 2d 120, 124 n.1 (D.D.C. 2012) (noting that <u>Redd</u> suggested in dictum that <u>Browning-Ferris</u> was the preferred method of evaluating joint-employer analysis in cases like the one before the Court).

employer of the plaintiff under the Spirides analysis.  As to the issue of control, the plaintiff had

significant autonomy in directing the UDC Service Center and deciding what her day-to-day

routine should be in order to advance the goals of the UDC Service Center.  For example, the

plaintiff "was responsible for preparing [the] UDC [Service Center]'s strategy to achieve the

contractual goals specified in the Howard[-]UDC subcontract, as well as [the] work plans for the

UDC Service Center."  Pl.'s Summ. J. Facts ¶ 42; see also id. ("[The plaintiff] was responsible

for preparing the Strategic Action Plan for the UDC Service Center and for creating the Strategic

Action Items for each of the Performance Indicators." (internal quotation marks omitted)); id. ¶

43 ("The plaintiff . . . [can]not recall that anyone at the Howard Lead Center ever told UDC that

it had [to] follow a work plan, marketing plan, or strategic action plan written by Howard.  [The

plaintiff] . . . [can]not recall anyone at Howard ever asking her to change the strategic plans or

work plans which she had prepared." (citations and internal quotation marks omitted)).  She was

also able to "create[] her own schedule to best address the goals of the UDC Service Center."  Id.

¶ 39 (internal alteration omitted).  And "when counseling clients[]" or "selecting topics for

training workshops," the plaintiff "use[d] her own professional judgment."  Id. ¶ 41.  However,

Howard "never denied permission for [the] UDC [Service Center] to give a workshop that [it]

proposed."  Id.  Notably, the plaintiff's "direct supervisor" was Dean Mahone and not anyone at

Howard.  Id. ¶ 30.

　　The Standard Operating Procedures, which Howard promulgated in December 2010,[10]

shed further light on the issue of control.  See id. ¶ 31.  In outlining the expectations for a Service

Center Director, the Standard Operating Procedures state that:

---

[10] The Standard Operating Procedures were revised "[a]round December 2010."  Pl.'s Summ. J. Facts ¶ 31.

(continued . . .)

A [Service] Center Director is responsible for the management and services provided at an individual [Small Business Network] [S]ervice [C]enter location. He/she is also responsible for the supervision of any staff in [his/her] [Service] [C]enter.  In addition to the steps required for every new employee, [Service] Center Directors will be required to receive information and training on [the Small Business Network] budget and the final report system by the Financial Control Manager in the [Howard] Lead Center.  They must also receive training on the current reporting system software and other software programs currently used by the [Small Business Network] and to shadow a [Service] Center Director in the [Howard] Lead Center to observe work process and at least one (1) full day client consultation.  Also, a [Service] Center Director will make at least one (1) visit to another [Small Business Network] [Service] [C]enter to observe operations and perform work functions.  He/she must also meet with and receive training from the host institution for [his/her] [Service] [C]enter on the operation requirements of that host.

Def.'s Summ. J. Mem., Ex. 13 (The District of Columbia Small Business Development Center Standard Operating Procedures ("Standard Operating Procedures")) at 17; see also id. at 53-54 (listing additional responsibilities for Service Center Directors).  Nowhere in the Standard Operating Procedures[11] does it demonstrate that Howard directed and controlled the specific means by which the plaintiff fulfills her responsibilities as the UDC Service Center Director.  At most, the Standard Operating Procedures establish that Howard monitored the plaintiff for quality control purposes; in other words, it set out certain high-level personnel requirements for all Service Center employees to fulfill so that the Small Business Network would maintain its accreditation from the Association, which in turn allowed Howard to remain eligible for funding from the Small Business Administration.  See id. at 15 ("The [Howard] Lead Center will review the adequacy of the [Service] [C]enter's staffing pattern, adherence to host institution

---

(. . . continued)

[11]  The parties have only attached excerpts of the Standard Operating Procedures.  The Court presumes that those portions not attached to the parties' submissions contain information that is either immaterial or irrelevant to the Court's summary judgment analysis.

procedures, and ability to provide core services during annual internal audits."); <u>see also</u> <u>id.</u> at

15-17 (imposing certain training requirements and mandating certain orientations for employees

of the Service Centers).  Such oversight from Howard, <u>see, e.g.,</u> Pl.'s Opp'n at 17, however, is

insufficient to establish that it was a joint employer of the plaintiff, <u>see</u> <u>Jacobson v. Comcast</u>

<u>Corp.</u>, 740 F. Supp. 2d 683, 690 (D. Md. 2010) ("[S]upervision and control is probative of an

employment relationship only when the oversight demonstrates effective control over the

schedule and conditions of employment.  The nature of the control exercised by [a] putative joint

employer is the key element in this analysis.  This factor does not contemplate the generic

control exercised by a supervisor over an independent contractor.  Therefore, detailed

instructions and a strict quality control mechanism will not, on their own, indicate an

employment relationship.  Indeed, detailed instructions and close monitoring are key components

in many independent contractor and franchise relationships.  A high level of supervision and

control is not an automatic trigger for joint employment." (citations and footnote omitted)).

Next, Howard never intended to convert the personnel at the UDC Service Center into

Howard employees.  In pertinent part, the Standard Operating Procedures delegate daily

personnel management to the UDC Service Center and not Howard:

> Unless otherwise provided in this operating standard or in Operating Standard 2.4,
> the hiring, retention, management and termination of [Small Business Network]
> employees will be governed by the standard written personnel policies of the
> respective host/sponsoring institution. . . . The personnel policies of the
> host/sponsoring institution will govern all [Small Business Network] personnel
> matters including, but not limited to, recruitment, hiring, fringe benefits, health
> and insurance plans, holidays, sick leave, vacation leave, disciplinary actions,
> promotions, cost of living increments, leaves of absence and termination. These
> personnel policies will govern the employment of faculty, professional, support,
> clerical and student employees of the [Small Business Network] at that institution.

Def.'s Summ. J. Mem., Ex. 13 (Standard Operating Procedures) at 53; see also Pl.'s Summ. J.

Facts ¶ 31.  The Standard Operating Procedures also state that the "salaries, benefits, personnel

policies and procedures are established by the host institution of that particular [Small Business

Network] [Service] Center."  Def.'s Summ. J. Mem., Ex. 13 (Standard Operating Procedures) at

53; see also Pl.'s Summ. J. Facts ¶ 31.  Tellingly, prior to this litigation, the plaintiff never

viewed Howard as her employer.  This reality is demonstrated by the fact that after "[the

plaintiff] left UDC," she applied for a new job and "listed UDC as her employer[] and [Dean]

Mahone as her immediate supervisor, with no mention of Howard or anyone at Howard."  Pl.'s

Summ. J. Facts ¶ 33.

     Further, Howard's decision to subcontract with UDC "to provide small-business

development services" at UDC, id. ¶¶ 2-3, was a prudent business decision.  The record evidence

establishes that subcontracting with UDC, as well as other non-profit organizations in the District

of Columbia, was necessary so that Howard could ensure that the Small Business Network

expanded to "different parts of the city."  Id. ¶¶ 1-3.

     Finally, as the Court has already explained, the degree of control that Howard exercised

over the plaintiff was not unreasonably excessive because the plaintiff's employment with UDC

shared common attributes with employees who work for independent contractors.  Compare,

e.g., Redd, 232 F.3d at 939, 940 (listing factors suggesting lack of joint employment, such as

when subcontractor pays the employee, affords the employee leave, and provides the place of

work), with Def.'s Summ. J. Mem., Ex. 13 (Standard Operating Procedures) at 53 (explaining

that the "personnel policies of [UDC] will govern all . . . personnel matters including, but not

limited to, recruitment, hiring, fringe benefits, health and insurance plans, holidays, sick leave,

vacation leave, disciplinary actions, promotions, cost of living increments, leaves of absence and

termination"), Pl.'s Summ. J. Facts ¶ 29 ("UDC carried [the plaintiff] on its payroll, issued her paychecks, and provided her with health and disability insurance.  [The plaintiff]'s office was located at UDC.  She was subject to UDC's leave policies.  [The plaintiff] was at UDC almost every workday, and generally did not visit Howard's Lead Center more than a couple of days a month." (citations omitted)), and id. at 16 ¶ 32 (admitting "that [the] defendant did not pay [the plaintiff] a salary, social security benefits, or provide [the plaintiff] with benefits; that Howard did not provide [the plaintiff] with a place to work, provide [the plaintiff] with annual leave, or set the leave policies that governed [the plaintiff]'s employment; [and] that Howard had no authority to discipline [the plaintiff] . . . .").  Howard's degree of supervision is not unusual in circumstances where an employee works for a subcontractor.  See, e.g., Moreau v. Air France, 356 F.3d 942, 951 (9th Cir. 2004) (supervision of workers not indicative of joint employment where contractor was "very specific about how it wanted its work performed, and [the contractor] checked to ensure that its standards were met and that the [subcontractor]'s overall performance adhered to [the contractor]'s specifications").  The plaintiff makes no attempt to distinguish the relationship between Howard and herself from the typical employee who works for a subcontractor and that employee's relationship with the contractor.  Accordingly, Howard is not a joint employer under the Spirides test.

### 2.  The **Browning-Ferris** Test

The Browning-Ferris test leads the Court to the same conclusion.  Under this analysis, the Court must assess "whether 'one employer, while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.'"  Redd, 232 F.3d at 938 (quoting Browning-Ferris, 691 F.2d at 1123).  Factors for the Court to consider under the

<u>Browning-Ferris</u> test include: "[(1)] the alleged employer's authority to hire and fire the relevant employees; [(2)] the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; [(3)] the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and [(4)] the alleged employer's actual control of employee records, such as payroll, insurance, or taxes." <u>In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig.</u>, 683 F.3d 462, 469 (3d Cir. 2012); <u>see also</u> <u>id.</u> (noting also that list of specified factors is not exhaustive and that the Court should account for any variables that clarify the total employment situation).

Here, none of the facts in the record would permit a reasonable jury to find that Howard was a joint employer of the plaintiff as a matter of law.  First, although it is undisputed that Howard has some control[12] over the hiring of Service Center Directors, as it must "concur in the appointment" of any new Service Center Director at UDC, Pl.'s Summ. J. Facts ¶ 31 (internal quotation marks omitted), this authority to "pre-screen" candidates for a particular position does not equate to a sufficient control of the terms and conditions of the plaintiff's employment because once a Service Center Director is hired, Howard lacks the authority to fire the Director.[13]

---

[12]  Contrary to the plaintiff's suggestion that Howard could "force" the UDC Service Center to "hire its chosen candidate for [a Service] Center Director [position]," Pl.'s Opp'n at 16, that does not appear to be an accurate reflection of the record, <u>see</u> Def.'s Reply at 10 (citing Def.'s Summ. J. Mem., Ex. 12 (Charlie Mahone Deposition Transcript ("Mahone Dep. Tr.")) at 144:21-145:2).

[13]  The plaintiff mistakenly argues that Howard's "ability to terminate [the plaintiff]'s employment through its rescission of the UDC sub-grant" illustrates that a joint employer relationship existed in this case.  Pl.'s Opp'n at 17.  As a matter of law, Howard's ability to not renew the subcontract with UDC does not confer upon itself the actual authority to terminate the plaintiff's employment.  <u>Simms</u>, 587 F. Supp. 2d at 274 ("[The contractor] did not have . . . the authority to terminate [the subcontractor's] employees.  Rather, [the] plaintiff's 'termination' was due to [the contractor]'s decision not to renew the contract with [the subcontractor]."); <u>see also</u> <u>Santichen v. Greater Johnstown Water Auth.</u>, No. 06-cv-72(KRG), 2008 WL 868212, at *11 (W.D. Pa. Mar. 31, 2008) (recognizing that "[t]he mere fact that [the plaintiff's] continued employment with [the subcontractor] was dependent upon [the subcontractor]'s

(continued . . .)

Simms v. D.C. Gov't, 587 F. Supp. 2d 269, 274-75 (D.D.C. 2008); see also Redd, 232 F.3d at 940 ("As to [the plaintiff]'s termination, while the contract gives the [contractor] the right to reject any guide, under the contract the decision to terminate the . . . employment with [the subcontractor] is solely within [the subcontractor]'s power. . . . [T]he [contractor]'s command to remove a specific worker (say, on grounds of rudeness or just personal incompatibility) would hardly render the worker an employee of the [contractor]."); Santichen v. Greater Johnstown Water Auth., No. 06-cv-72(KRG), 2008 WL 868212, at *10 (W.D. Pa. Mar. 31, 2008) (finding no joint-employer relationship under Browning-Ferris test where, inter alia, contractor "reserved the right to monitor [subcontractor]'s personnel decisions" for quality control purposes, but "did not reserve the right to direct the hiring (or dismissal) of a particular employee" even though the contractor had the right to "agree as to who was . . . [hired]").

Second, it is undisputed that personnel matters such as workplace rules and conditions of employment were handled by UDC, not Howard.  Def.'s Summ. J. Mem., Ex. 13 (Standard Operating Procedures) at 53 ("The personnel policies of [UDC] will govern all . . . personnel matters including, but not limited to, recruitment, hiring, fringe benefits, health and insurance

---

(. . . continued)
contract with the [contractor] did not transform the [contractor] into [the plaintiff's] employer").  Likewise, when Howard recommended that the UDC Service Center replace the plaintiff with someone whom Howard approved or face the possibility of losing the subcontract, see Pl.'s Opp'n at 17 (citing Pl.'s Opp'n, Ex. 11 (Apr. 7, 2011 Letter) at 3; Pl.'s Opp'n, Ex. 13 (May 11, 2011 Letter) at 2), this also was not tantamount to an ability to terminate the plaintiff's employment, see Braden v. Cnty. of Wash., No. 08-cv-574(DWA), 2010 WL 1664895, at *7 (W.D. Pa. Apr. 23, 2010) (concluding that the defendant was not plaintiff's joint employer because, inter alia, it lacked the power to terminate the plaintiff's employment, even where the defendant had recommended that the plaintiff be "suspended, written up, and fired"); Vrabel v. Greater Johnstown Water Auth., No. 06-cv-73(KRG), 2008 WL 868152, at *11 (W.D. Pa. Mar. 31, 2008) ("The Court acknowledges that [the plaintiff's] continued employment with [the subcontractor] was dependent upon [the subcontractor's] contract with the [contractor], and that [the subcontractor]'s decision to terminate [the plaintiff] was directly triggered by the [the contractor]'s decision to discontinue its business relationship with [the subcontractor].  Nonetheless, the mere fact that [the plaintiff]'s termination was incidentally caused by a decision made by the [the contractor] did not transform the [the subcontractor] into his employer.").  Also indicative of Howard's inability to terminate the plaintiff's employment is that it did not do so on its own; instead it suggested that the UDC Service Center replace the plaintiff.

plans, holidays, sick leave, vacation leave, disciplinary actions, promotions, cost of living

increments, leaves of absence and termination."); see also Pl.'s Summ. J. Facts ¶¶ 29-31; id. at

16 ¶ 32 (admitting "that [the] defendant did not pay [the plaintiff] a salary, social security

benefits, or provide [the plaintiff with] benefits; that Howard did not provide [the plaintiff] with

a place to work, provide [the plaintiff with] annual leave, or set the leave policies that governed

[the plaintiff]'s employment; [and] that Howard had no authority to discipline [the plaintiff] . . .

."). And there is no dispute that UDC "had [the plaintiff's] personnel files." Pl.'s Summ. J.

Facts ¶ 29.

The plaintiff makes much of the fact that Howard was "solely responsible for [the]

oversight of the daily operations of the UDC [Service] Center," Pl.'s Opp'n at 17; see also id. at

18 ("The Executive Director at the [Howard] Lead Center was solely responsible for overseeing

the day-to-day operations of the UDC [Service] Center . . . ."), which is consistent with what is

laid out in the Standard Operating Procedures, see Def.'s Summ. J. Mem., Ex. 13 (Standard

Operating Procedures) at 15 ("The [Howard] Lead Center will review the adequacy of the

center's staffing pattern, adherence to host institution procedures, and ability to provide core

services during annual internal audits."). But this fact does little to convert Howard into a joint

employer, as the record evidence cited by the plaintiff does not detail the degree of this daily

oversight over the UDC Service Center, i.e., what and how much daily control Howard had over

the plaintiff. Moreover, to the extent that Howard oversaw the operations of the UDC Service

Center on a daily basis, it remains undisputed that:

- "[the plaintiff], as [UDC] Service Center [D]irector, created her own schedule to best
  address the goals of the [UDC] Service Center";
- "[the plaintiff] was responsible for preparing [the] UDC [Service Center]'s strategy to
  achieve the contractual goals specified in the Howard[-]UDC subcontract, as well as
  [the] work plans for the UDC Service Center";

- "[the plaintiff] was responsible for preparing the Strategic Action Plan for the UDC Service Center and for creating the Strategic Action Items for each of the Performance Indicators";
- "[the plaintiff] had to use her own professional judgment when counseling clients[] and in selecting topics for training workshops"; and
- "[t]he Howard Lead Center never denied permission for UDC to give a workshop that UDC propose."

Pl.'s Summ. J. Facts ¶¶ 39-42 (internal quotation marks omitted); see also id. ¶ 37 ("Before [Mr.] Turner's departure in July 2010, . . . [the plaintiff] very rarely met alone with [Mr.] Turner." (internal quotation marks omitted)); id. ¶ 43 ("[The plaintiff] . . . [can]not recall that anyone at the Howard Lead Center ever told UDC that it had [to] follow a work plan, marketing plan, or strategic action plan written by Howard.  [The plaintiff] . . . [can]not recall anyone at Howard ever asking her to change the strategic plans or work plans which she had prepared." (internal quotation marks omitted)); id. ¶ 44 ("[The plaintiff] . . . can[not] recall that [Mr.] Turner, at the Howard Lead Center, ever refused to approve something she wanted to do."  (internal quotation marks omitted)); id. ¶ 46 ("No one at [the] Howard [Lead Center] gave [the plaintiff] guidance, following her semi-annual reports, that the UDC [Service] Center should try doing something a little differently." (internal quotation marks omitted)); id. ¶ 47 ("After January 2010, the [Service] [C]enters worked more independently, and there was decreased cooperation with [the] Howard[] Lead Center." (internal quotation marks omitted)); Def.'s Summ. J. Mem., Ex. 8 (Miles Dep. Tr.) at 56:2-17 (the plaintiff recalling that after Mr. Turner left in July 2010, "there [was not] much oversight relating to the operations of the [S]ervice [C]enters").  So the extent of oversight that Howard exercised over the UDC Service Center did not relate to the "essential

terms and conditions [of the plaintiff's] employment," <u>Browing-Ferris</u>, 691 F.2d at 1123

(internal quotation marks omitted).[14]

     Because Howard was not a joint employer under either the <u>Spirides</u> or the <u>Browning-</u>

<u>Ferris</u> tests, the Court will grant Howard's motion for summary judgment as to all of the

plaintiff's claims against Howard.

### B. The Plaintiff's Retaliation And Interference Claims Under The FLMA And Retaliation Claim Under The DCFLMA

     Even if the Court could conclude that Howard was a joint employer of the plaintiff, it

would still be compelled to grant summary judgment to Howard on count one of the complaint,

which asserts retaliation and interference claims under the FLMA, as well as count two, which

asserts a retaliation claim under the DCFLMA. <u>See</u> Compl. ¶¶ 116-38.  In the context of

summary judgment, a retaliation claim under either the FMLA or the DCFMLA is scrutinized

under the familiar burden-shifting framework laid out in <u>McDonnell Douglas Corp. v. Green</u>,

411 U.S. 792, 802-03, 807 (1973).  <u>See, e.g.</u>, <u>Alford v. Providence Hosp.</u>, 945 F. Supp. 2d 98,

108 (D.D.C. 2013), <u>aff'd</u>, 561 F. App'x 13 (D.C. Cir. 2014) (applying <u>McDonnell Douglas</u> to

retaliation claims under both statutes); <u>Cobbs v. Bluemercury, Inc.</u>, 746 F. Supp. 2d 137, 142

(D.D.C. 2010) (explaining that "[c]ourts interpret the FMLA and the DCFMLA similarly" and

applying <u>McDonnell Douglas</u> to FMLA and the DCFMLA retaliation claims).  Under this

---

[14]   If the Court could draw the favorable inference that Howard micromanaged the daily operations of the UDC Service Center—which would be unreasonable because the record evidence suggests otherwise—it would still find that Howard was not a joint employer in light of the undisputed facts concerning the relationship between Howard and the plaintiff.  <u>See</u> <u>In re Enter. Rent-A-Car</u>, 683 F.3d at 471 ("When a legal standard requires the balancing of multiple factors, as it does in this case, summary judgment may still be appropriate even if not all of the factors favor one party . . . ."); <u>Zheng v. Liberty Apparel Co. Inc.</u>, 355 F.3d 61, 76-77 (2d Cir. 2003) ("In order to grant summary judgment for defendants, the [d]istrict [c]ourt would have to conclude that, even where both the historical facts and the relevant factors are interpreted in the light most favorable to [the] plaintiffs, [the] defendants are still entitled to judgment as a matter of law.  To reach this conclusion, the Court need not decide that <u>every</u> factor weighs against joint employment." (emphasis in original) (footnote omitted)).

burden-shifting framework, the plaintiff may establish a prima facie case, creating a presumption

of retaliation, by showing that (1) the plaintiff exercised rights afforded by the FMLA or

DCFMLA; (2) the plaintiff suffered an adverse employment action; and (3) there was a causal

connection between the exercise of the plaintiff's statutory rights and the adverse employment

action.  Alford, 945 F. Supp. 2d at 108.  Once the plaintiff establishes a prima facie case, the

burden shifts to the defendant to proffer a legitimate basis for the adverse employment action.

Id.  Where the alleged retaliatory, adverse action is the plaintiff's termination, "the burden is on

[the defendant] to show that it had a legitimate reason, unrelated to the exercise of FMLA [or

DCFMLA] rights, to terminate [the plaintiff] . . . ."  Hopkins v. Grant Thornton Int'l, 851 F.

Supp. 2d 146, 155-56 (D.D.C. 2012), aff'd sub nom., Hopkins v. Grant Thornton, LLP, 529 F.

App'x 1 (D.C. Cir. 2013).  In other words, the defendant has the burden of showing that during

the plaintiff's statutory leave, the plaintiff "would have been dismissed regardless of the

employee's request for leave."  Id.  "If the [defendant] successfully presents a legitimate, non-

retaliatory reason for its actions, 'the presumption raised by the prima facie is rebutted and drops

from the case.'"  Deloatch v. Harris Teeter, Inc., 797 F. Supp. 2d 48, 67-68 (D.D.C. 2011)

(quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993)).

　　The Court must then resolve the lone question of whether the plaintiff has "produced

sufficient evidence for a reasonable jury to find that the [defendant]'s asserted non-retaliatory

reason was not the actual reason and that the employer intentionally retaliated against the

employee . . . ."  Id. (internal quotation marks omitted); see also Jones v. Bernanke, 557 F.3d

670, 677 (D.C. Cir. 2009) ("If the . . . [defendant puts forth a legitimate, non-retaliatory reason],

'the burden-shifting framework disappears, and a court reviewing summary judgment looks to

whether a reasonable jury could infer retaliation from all the evidence,' which includes not only

the prima facie case but also the evidence the plaintiff offers to 'attack the [defendant]'s proffered explanation for its action' and other evidence of retaliation." (ellipses omitted) (quoting Carter v. George Washington Univ., 387 F.3d 872, 878 (D.C. Cir. 2004))).  "In other words, [whether] the plaintiff 'show[ed] both that the reason was false[] and that retaliation was the real reason.'"  Deloatch, 797 F. Supp. 2d at 68 (ellipses omitted) (quoting Weber v. Battista, 494 F.3d 179, 186 (D.C. Cir. 2007)).  Relevant evidence demonstrating such a showing includes pretext.  Jones, 557 F.3d at 679.  "[E]vidence of pretext is . . . usually . . . enough to get a plaintiff's [retaliation] claim to a jury."  Id. (citations and internal alterations and ellipses omitted).  Pretext can be shown by citing evidence that suggests the defendant was "making up or lying about the underlying facts that formed the predicate for the employment decision." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 495 (D.C. Cir. 2008).  "If the [defendant]'s stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the [defendant] is lying about the underlying facts."  Id.

Here, Howard concedes that the plaintiff has established a prima facie case of retaliation, but contends that it had a legitimate basis for terminating the plaintiff.  See Def.'s Summ. J. Mem. at 35 n.34, 38.  Specifically, Howard represents that it terminated the Howard-UDC subcontract in May 2011 because "the UDC Service Center was the worst performing center in the network, and Howard reasonably concluded that its performance would not improve."  Id. at 38; see also Pl.'s Summ. J. Facts ¶¶ 54-55, 58, 61-62, 65, 68-69, 72, 90, 109-10, 120-23, 133, 136, 139.  Indeed, after the termination of the subcontract, the Small Business Administration "concluded during a . . . review of the [Small Business] [N]etwork that . . . [the] termination . . . was managerially and strategically sound."  Pl.'s Summ. J. Facts ¶ 139.  And the Small Business

Network would ultimately "regain[] full . . . accreditation" from the Association, id., which was previously "deferred" in March 2011, id. ¶ 88.  The Court finds that "[a] planned reduction in force necessitated by business conditions is a legitimate reason for terminating an employee." Cobbs, 746 F. Supp. 2d at 142 (internal quotation marks omitted); see also Goss v. George Washington Univ., 942 F. Supp. 659, 664 (D.D.C. 1996) (granting summary judgment against plaintiff where "a reduction in [work]force" was a "legitimate" business reason to dismiss the plaintiff).

Notwithstanding Howard's explanation for terminating the Howard-UDC subcontract, the plaintiff insists that Howard's proffered business reason is merely pretext.  See Pl.'s Opp'n at 22-25.  But the grounds offered as support for the plaintiff's allegation of pretext are individually and collectively insufficient for a reasonable jury to reach that same conclusion.  The Court rejects the plaintiff's proposition that Howard harbored a "discriminatory animus against employees who take maternity leave" because Howard only required a continuity plan from the plaintiff who was pregnant.[15]  Id. at 22.  It is undisputed that the plaintiff "never heard anyone at the Howard Lead Center make negative remarks about people who went out on family medical leave, people who got pregnant, people who had to take leave in order to care for family members, or about women based on their gender," Pl.'s Summ. J. Facts ¶ 25 (internal quotation marks omitted), and that the plaintiff "has no information, and there is no evidence[,] that anyone who worked at the [Small Business Network] who took FMLA leave suffered any problems in [his/her] jobs afterwards," id. ¶ 26 (internal alteration and quotation marks omitted); see also

---

[15]  On this point, the plaintiff offers the deposition testimony of Dean Harvey.  Pl.'s Opp'n at 22 (citing Pl.'s Opp'n, Ex. 15 (Deposition Transcript of Barron Harvey ("Harvey Dep. Tr.") at 52)).  But Dean Harvey's testimony does not show either directly or indirectly that continuity plans were not required from Service Center Directors taking other types of statutory leave, as no other Service Center Directors were pregnant or planned to be on leave for any other reason.  Pl.'s Opp'n, Ex. 15 (Harvey Dep. Tr.) at 52:10-21.

Pl.'s Opp'n at 23 (conceding that Howard "considered terminating the [Howard-]UDC subcontract long before [the] plaintiff took leave" (internal quotation marks omitted)).  In fact, "[o]ne female employee of the Howard Lead Center who took pregnancy-related leave was promoted upon her return."  Pl.'s Summ. J. Facts ¶ 27.  And when Mr. Brown learned of the plaintiff's leave from the UDC Service Center, he actually "wished her well."  Id. ¶ 92.  In light of these undisputed facts, a reasonable jury could not find that Howard harbored any discriminatory animus against the plaintiff for taking maternity leave.

Next, the plaintiff mischaracterizes the record evidence in arguing that Howard "singled out [the plaintiff]'s FMLA [and DCFLMA] leave as a reason for placing the UDC [Service] Center on probation[] and only made the decision to shut down the UDC [Service] Center once it became clear that [the UDC Service Center] was not going to terminate [the plaintiff]."[16]  Pl.'s Opp'n at 22.  Howard did not "single out" the plaintiff's decision to take maternity leave as a reason for placing the UDC Service Center on probation; rather, probation was necessary, in part because the plaintiff failed to make arrangements for counseling services at the UDC Service Center during her absence.  See Pl.'s Summ. J. Facts ¶¶ 92-93, 97 (plaintiff admitting that despite her "obligation to make arrangements for the servicing of [the] UDC [Service Center]'s clients while she . . . [was] out on expected maternity leave," she "had not . . . informed the Howard Lead Center of any plan for servicing [the] UDC [Service Center]'s clients during the period in which [the plaintiff was] expected to be on leave" prior to her maternity leave); id. ¶ 105 ("Mr. Brown was concerned when he learned 'that counseling services were not being provided at [the] UDC [Service Center]'").  And the decision to terminate the subcontract

---

[16]  It is unclear whether the plaintiff's citation to Darrell Brown's deposition testimony even supports this argument.  See Pl.'s Opp'n at 22 (citing Ex. 1 (Deposition Transcript of Darrell Brown ("Brown Dep. Tr.") at 126-28, 134)).

thereafter was due to a number of reasons independent of whether the UDC Service Center would replace the plaintiff.  See Pl.'s Summ. J. Facts ¶¶ 78-79, 109-10, 120-23, 133, 136; see also Def.'s Summ. J. Mem., Ex. 8 (Miles Dep. Tr.) at 195:4-197:10; Summ. J. Mem., Ex. 25 (Apr. 7, 2011 Letter) at 2-3 (identifying several "major deficiencies" at the UDC Service Center and requiring it to submit a recovery plan to Howard within thirty days); Summ. J. Mem., Ex. 23 (May 11, 2011 Letter) at 1-2 (enumerating many reasons why the UDC Service Center's proposed recovery plan was "inadequate" and ordering it to agree to several conditions in order to save the subcontract); Summ. J. Mem., Ex. 27 (May 24, 2011 Letter) at 1 & n.1 (terminating subcontract for failing to follow conditions imposed by Howard).  In light of the pressure from the Small Business Administration and the Association accreditation team to improve the Small Business Network, see ¶¶ 61-63, 65-66, 68-69, 71-72, 78-79, 88-90, 109-10, the communications between Howard and the UDC Service Center do not demonstrate that the "determinative factor" or that the "real" and "true reason" for terminating the Howard-UDC subcontract was because of the plaintiff's maternity leave,  Roseboro v. Billington, 606 F. Supp. 2d 104, 110 (D.D.C. 2009) ("The employee must demonstrate that retaliation was not just 'a mere factor among many,' but the 'determinative factor' or 'real' and 'true reason' behind the adverse action." (quoting Provencher v. CVS Pharmacy, Div. of Melville Corp., 145 F.3d 5, 10 (1st Cir. 1998))).[17]

---

[17]  The plaintiff does not appear to dispute that there must be sufficient evidence for a jury to find that Howard's retaliation was the "determinative" factor that led Howard to terminate the subcontract.  But it appears that the plaintiff has somewhat implicitly conceded that she cannot meet this burden.  Compare Pl.'s Opp'n at 25 (recognizing that record evidence must be sufficient for a reasonable jury to find that the plaintiff's maternity leave was the "predominant cause" for Howard's termination of the subcontract (emphasis added)), with id. at 22 ("[T]here is sufficient evidence to show that [the plaintiff]'s FMLA leave was at least a motivating factor in Howard's adverse employment actions." (emphasis added)).  Even if the Court could apply a less-exacting standard, the record evidence still would not permit a reasonable jury to find that "a motivating factor" for Howard's termination of the subcontract was the plaintiff's maternity leave because the undisputed facts demonstrate that Howard terminated the subcontract at a time when Howard was pressured to make changes to the Small Business

(continued . . .)

Instead, the evidence more than reasonably shows that Howard terminated the subcontract because it was under pressure from the Small Business Administration and the Association to reevaluate and reform the Small Business Network, and the UDC Service Center refused to implement improvements Howard suggested, including hiring a new Director for the UDC Service Center, even though it was the worst-performing Service Center in the Small Business Network under the plaintiff's leadership.  Brady, 520 F.3d at 495 ("there ordinarily is no basis for permitting a jury to conclude that the [defendant] is lying about the underlying facts" if they are "reasonable in light of the evidence").

Much of the plaintiff's support for her theory of pretext relies on the basis that other Service Centers in the Small Business Network were as deficient as the UDC Service Center, but Howard took no corrective actions against those other Service Centers and only took such actions against the UDC Service Center after learning of the plaintiff's maternity leave in the spring of 2011.  See Pl.'s Opp'n at 24.  But the undisputed facts belie the plaintiff's attempt to draw parallels between the performance of the UDC Service Center and that of other Service Centers in the Small Business Network.  Although the Small Business Network may have been underperforming as a whole for a prolonged period of time and the UDC Service Center's performance may have "only [been] marginally worse" than its counterparts, it is still undisputed that at all relevant times the UDC Service Center "was the worst-performing [Service] [C]enter in the [Small Business] [N]etwork."[18]  Pl.'s Summ. J. Facts ¶ 58 (internal quotation marks

---

(. . . continued)
Network by the Small Business Administration and the Association, and the UDC Service Center did not implement Howard's recommendations to improve its performance.

[18]  The plaintiff argues that Howard did not terminate a subcontract with another Service Center—the District of Columbia Chamber Center—despite the fact that it was without a Service Center Director during the relevant period

(continued . . .)

omitted); see also id. ¶¶ 54-55, 65, 72, 82.  Furthermore, the Association accreditation team

singled out the UDC Service Center's performance as being "especially problematic" in

December 2010.  Id. ¶ 62; see also id. ¶ 69 ("[The Association accreditation team] also told

Howard that [it] needed to take a hard look at UDC." (internal quotation marks omitted)); id. at

21-22 ¶ 64 ("By December 2010, [the plaintiff] was concerned that her job was in jeopardy in

light of the goals and performance of the UDC Service Center.  She was concerned that the

performance of the UDC Service Center in 2010 might be viewed as inadequate as a basis for

renewing that sub-grant.  This was before she informed anyone at Howard about her pregnancy."

(citations and internal quotation marks omitted)).[19]  And thereafter, in March 2011, "[the Small

Business Administration] called for tough decisions by Howard, including the immediate need to

put action plans in place to address concerns about the quality and strength of partnerships

needed for an effective [Small Business Network].  UDC was the worst performing such

partnership."  Id. ¶ 90 (citations and internal ellipses and quotation marks omitted); see also id. ¶

71; Def.'s Summ. J. Mem., Ex. 22 (March 21, 2011 Letter from Small Business Administration

to Howard ("Mar. 21, 2011 Letter") at 1).  As Howard correctly observes, the "status of the

[Small Business Network] reached a crisis point between December 2010 and March 2011,"

---

(. . . continued)

of time, and thus it had to refer clients to other Service Centers, which is the continuity plan that the plaintiff put into
effect during her maternity leave.  Pl.'s Opp'n at 24.  But by the plaintiff's own admission, the District of Columbia
Chamber Center and the UDC Service Center were not "equally non-functioning," id. at 25, as "[t]he [District of
Columbia] Chamber's Service Center was not the worst-performing [Service] [C]enter," Pl.'s Summ. J. Facts ¶ 91.
More importantly, "it continued to provide counseling services . . . through a business counselor," id., whereas the
plaintiff "did not even try to arrange to hire temporary counselors for the [UDC Service Center during the] period in
which she planned to be out on [maternity] leave," id. ¶ 101; see also id. ¶¶ 78-79, 122, 133.

[19]  The deposition testimony cited by the plaintiff does not address Howard's proffered facts, and thus these facts are
undisputed.  See, e.g., Am. Fed'n of State, Cnty., & Mun. Emps. Local 2401 v. District of Columbia, 31 F. Supp. 3d
149, 150 n.2 (D.D.C. 2014) (deeming the defendant's proffered facts as admitted where the plaintiffs'
"countervailing facts . . . (1) are not supported by the evidence to which [the] [p]laintiffs cite, (2) do not address
the factual allegation raised by [the] [d]efendant, and/or (3) do not create a dispute of fact").

Def.'s Reply at 14; see also id. at 16-17, Pl.'s Summ. J. Facts at 21-22 ¶ 64, which unfortunately coincided with the time when the plaintiff exercised her statutory rights to take maternity leave and set into action the events that led to her termination.  Cf. Hopkins, 851 F. Supp. 2d at 153 (noting that a "perfect storm" of non-retaliatory events, as opposed to retaliation for engaging in protected activity, led to alleged adverse employment action).  The plaintiff has not presented sufficient evidence for a reasonable jury to find that Howard retaliated against her for exercising her rights under the FLMA and the DCFLMA or that Howard's business reason for terminating the subcontract—namely that the UDC Service Center was the worst-performing Service Center in the Small Business Network—was not the real and true reason for the termination.[20] Consequently, Howard is entitled to summary judgment on counts one and two as a matter of law.

### C.  The Plaintiff's Discrimination Claims Under Title VII And The DCHRA

Counts three and four of the plaintiff's complaint allege that Howard violated Title VII and the DCHRA by discriminating against the plaintiff on the basis of her sex and pregnancy. Compl. ¶¶ 139-59.  The Court need not expend much time assessing these claims.  See, e.g., Elhusseini v. Compass Grp. USA, Inc., 578 F. Supp. 2d 6, 18 (D.D.C. 2008) (Walton, J.) ("The DCHRA, like Title VII, prohibits certain discriminatory practices by an employer.  The legal standard for establishing discrimination under the DCHRA is substantively the same as

---

[20]  The Court's analysis of the plaintiff's FLMA interference claim goes hand-in-hand with its analysis of whether Howard's termination of the plaintiff was non-retaliatory, and thus lawful.  See Pl.'s Opp'n at 27 (citing Miles, 2013 WL 5817657, at *12-13); see also Gleklen v. Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1368 & n.3 (D.C. Cir. 2000) (explaining that a claim "is essentially one of retaliation" under the FLMA where plaintiff alleges that termination was due to maternity leave).  In other words, in this case the retaliation and interference claims under the FLMA must rise and fall together.  Because the Court has concluded that Howard's termination of the subcontract, which led to the plaintiff's dismissal from UDC, was not unlawful, the plaintiff's interference claim cannot survive summary judgment either.

under Title VII." (citation, and internal alterations, footnote, and quotation marks omitted)).  At

the summary judgment stage, the Court must assess these claims using the same burden-shifting

framework outlined above for the plaintiff's retaliation claims under the FLMA and DCFLMA.

See, e.g., McFadden v. Ballard Spahr Andrews & Ingersoll, LLP, 611 F.3d 1, 6 (D.C. Cir. 2010)

(explaining that the "analytical framework for . . . [a] claim of retaliation [under the FLMA] . . .

is essentially the same as that applicable to a claim of discrimination under Title VII"); Gleklen

v. Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1367 (D.C. Cir. 2000) (using

McDonnell Douglas to evaluate claims under the DCHRA and FMLA "simultaneously").

Application of this framework here yields the same result, as the parties have recycled

their respective arguments regarding the alleged retaliation under the FLMA and DCFLMA.  See

Def.'s Summ. J. Mem. at 44-45; Pl.'s Opp'n at 29-30.  Howard does not dispute that the plaintiff

has made a prima facie showing of discrimination.  See Def.'s Summ. J. Mem. at 44-45 (failing

to dispute prima facie case of discrimination).  Rather, Howard relies on the same legitimate

business reason for terminating the Howard-UDC subcontract that the Court discussed above: the

performance, or lack thereof, of the UDC Service Center.  Id. at 44.  The Court has already found

that, in terminating the UDC Service Center's subcontract, Howard neither did so with a

discriminatory animus nor treated the UDC Service Center any differently than a similarly

situated Service Center in the Small Business Network.  And there is insufficient evidence to

demonstrate that Howard's proffered business reason is merely pretext for discrimination.

Therefore, no reasonable jury could find that Howard terminated the subcontract on the basis of

the plaintiff's sex or pregnancy.[21]   Accordingly, the Court will grant summary judgment in favor of Howard on counts three and four.

## IV.   CONCLUSION

For the foregoing reasons, the Court grants Howard's motion for summary judgment.[22]

**SO ORDERED** this 16th day of March, 2015.

REGGIE B. WALTON
United States District Judge

---

[21]  To the extent the plaintiff sought to base her discrimination claims on Howard's alleged refusal to respond to an Equal Employment Opportunity complaint filed by the plaintiff, see Def.'s Summ. J. Mem. at 42 n.41 (citing Compl. ¶¶ 148, 159), the Court treats these claims as having been abandoned by the plaintiff, as her opposition to Howard's summary judgment motion does not explain how that alleged conduct is discriminatory, see, e.g., Noble Energy, Inc. v. Salazar, 691 F. Supp. 2d 14, 23 (D.D.C. 2010); Shankar v. ACS-GSI, No. 02-cv-1370(RMC), 2006 WL 1073073, at *4 (D.D.C. Apr. 24, 2006), aff'd, 258 F. App'x 344 (D.C. Cir. 2007).  The Court could also deem Howard's argument that any discrimination claims based on its alleged conduct is unsupported by the record, Def.'s Summ. J. Mem. at 42 n.41, as conceded, see, e.g., Hopkins v. Women's Div., Gen. Bd. of Global Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (Walton, J.) (the Court may treat arguments plaintiff failed to address as conceded in deciding summary judgment motions), aff'd sub nom., Hopkins v. Women's Div., Gen. Bd. of Global Ministries, United Methodist Church, 98 F. App'x 8 (D.C. Cir. 2004).  And in any event, the undisputed facts demonstrate that these claims are unfounded.  See Pl.'s Summ. J. Facts ¶ 143.

[22] The Court has contemporaneously issued an Order consistent with the Memorandum Opinion.

32